*Decision will be entered under Rule 50.*

JAMES A. LEWIS ENGINEERING, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 89639. Filed November 30, 1962.

William E. *Collins, Esq.*, for the petitioner.
*Harold D. Rogers, Esq.*, for the respondent.

OPINION.

BLACK, *Judge:*

*Preliminary Statement.*

We should make it plain at the outset that we are not dealing here with the $35,000 which petitioner received for its services in making a preliminary survey of the advisability and practicability of installing a waterflood program on the Seay lease. So far as the record shows that payment was received by petitioner in cash in a prior year and was returned as gross income in that year and it is not in issue here. Petitioner received no assignment of mineral interests in the Seay lease in connection with that $35,000 payment. What we do have in issue is whether the fair market value of the mineral interests in the Seay lease which petitioner received by way of the assignment made to it on October 16, 1957, represented taxable income paid to it as compensation for services rendered and to be rendered as the Commissioner has determined in his deficiency notice and still contends, or whether, as contended by petitioner, it represents a capital investment in the Seay lease and therefore its fair market value does not represent taxable income. It should also be made clear that the Commissioner is

making no contention that when petitioner received its assignment in 1957 of mineral interests in the Seay lease it did not receive an interest of oil in place which entitled petitioner to depletion. In fact it is stipulated that if we sustain the Commissioner in his contention, then in that event petitioner is entitled to an additional deduction on account of cost depletion of $15,279.

## *Issue (a).*

The first issue raised by petitioner which we have designated as Issue (a) is to the effect that even though the fair market value of the mineral interests assigned to it for its supervisory services in connection with the waterflood program on the Seay lease represented income to it, it was constructively received in 1953 and petitioner, being a cash basis taxpayer, the income was received in 1953 and would be taxable in that year and not in 1957. In support of its contention of constructive receipt petitioner relies upon the following language which was contained in the letter agreement described in our Findings of Fact:

Upon request, you will execute, acknowledge and deliver to us a proper, recordable instrument vesting in us the production payment and overriding royalty interest above set forth.

It is respondent's position that these interests were not received until 1957, the year in which the assignment was actually executed, and that the fair market value of these interests in the Seay lease was taxable income to petitioner in that year. The interests consisted of $65,000 payable out of one-eighth of seven-eighths of all flood production after one-eighth of seven-eighths of the flood production equaled $35,000, and, in addition, an overriding royalty interest of one-sixteenth of seven-eighths of flood oil production after petitioner had received $65,000. It is stipulated that: "The fair market value in 1957 of those mineral interests assigned to Petitioner by said instrument was $50,-500.00." Respondent contends that petitioner's right to receive the mineral interests was not vested and absolute in 1953 but was dependent upon a number of conditions which might never be fulfilled.

Petitioner apparently concedes that if petitioner's right to receive the mineral interests was conditional in 1953, then petitioner did not receive such interests in that year. Petitioner argues that there were no conditions in existence that would deprive petitioner of the right to these interests. The following language is taken from petitioner's brief:

The crucial question is whether or not there is any contingency remaining which might deprive the taxpayer of the right to have the conveyance made.

While we agree that the formalities of conveyancing are not determinative of depletable interests, *Anderson* v. *Helvering*, 310 U.S. 404

(1940), we are convinced from the record presented here that petitioner had no unqualified right in the mineral interests in 1953. In the first place, we note from the stipulation that all owners of interests in the Seay lease other than the two owners who executed the letter agreement of 1953 did not adopt, ratify, and confirm that letter agreement in question until 1956. Whatever rights petitioner was to receive in the Seay lease by the terms of the letter agreement were to be granted by all the owners of the Seay lease. As we have stated, this agreement was not adopted, ratified, and confirmed until 1956 and, therefore, the contract between all interested parties was not even in existence in 1953. Petitioner did not have an unqualified right to receive any interests in the Seay lease until such rights were agreed upon by all the owners.

We also find other conditions that make petitioner's rights contingent and qualified in 1953. The letter agreement of 1953 itself contains language described more fully in the Findings of Fact to the effect that *"if and when"* the operations of the Seay lease *"elected"* to proceed with a waterflood program, then petitioner would prepare a schedule and that upon approval of the schedule by the operators, *"then"* petitioner *"shall own"* a $65,000 oil payment as of the first day of the next month after the total proceeds shall have amounted to $35,000. We conclude from the letter agreement itself that the parties did not intend petitioner to have any mineral rights in the Seay lease unless the above-stated conditions were fulfilled. In addition, at the time the letter of November 10, 1953, was sent by Lewis Engineering to J. B. Stoddard and Continental Oil Company it was known that title to the Seay lease was the subject of a lawsuit commenced on October 19, 1953, and it was stipulated that the pendency of this suit caused the operators to postpone consideration of the waterflood program. Petitioner had no right to the oil payment and the overriding royalty until an affirmative election was made by the operators which election they postponed until final disposition of the suit in December 1956.

Petitioner had no mineral rights in the Seay lease in 1953 while, on the other hand, there is ample evidence to support respondent's determination that the interests were received by petitioner by virtue of the assignment made to it in 1957. The operators orally agreed at a meeting on December 17, 1956, that petitioner's right to the oil payment would commence on the first day of the first month next ensuing when the proceeds from the sale of one-eighth of seven-eighths of flood oil production amounted to $35,000. The proceeds going to make up the $35,000 were not to commence until January 1, 1957, and petitioner's mineral interests in the Seay lease vested subsequent to that time. The mineral interests in the Seay lease were

not assigned to Lewis Engineering until October 1957; accordingly, we do not believe petitioner has shown that respondent's determination, taking the fair market value of the interests received by petitioner into income in 1957, to be incorrect. We do not think it was constructively received in 1953 as petitioner contends.

Petitioner's reliance on the doctrine of constructive receipt of income is misplaced. Certainly, the Commissioner could not have attributed the fair market value of the mineral interests to petitioner under the circumstances narrated in our Findings of Fact prior to 1957 and the reverse is also true—petitioner cannot do it. *Harold W. Johnston*, 14 T.C. 560 (1950). Petitioner, a cash basis taxpayer, did not have unfettered command over these interests and it was not free to enjoy the interests at its option prior to 1957, cf. *Corliss* v. *Bowers*, 281 U.S. 376 (1930).

We hold for the respondent as to the first issue.

## *Issue* (*b*).

In view of the fact that we have sustained respondent's determination that the mineral interests were received by petitioner in 1957 we must consider petitioner's alternative argument. Petitioner contends that it acquired its interests in the Seay lease in return for its contribution of services to the development of the oil lease, that this is a capital investment and therefore a tax-free event and petitioner did not realize income in 1957 equal to the fair market value of the oil interests assigned.

In order to appreciate the significance of petitioner's contention it is necessary to examine the administrative, legislative, and judicial background of this issue.

Except for certain statutory exceptions set forth in the 1954 Code not applicable here, it is the general rule that in determining the tax aspects of a situation where property changes hands in a business transaction that the fair market value of the property exchanged is treated as the equivalent of cash. Where compensation for services is given in property, as was the case here insofar as the assignment of mineral interests is concerned, the fair market value of the property is reported as income in the year of receipt by the one who renders the services.[1] Petitioner contends that the present case is an exception to the general rule. At least since 1925[2] the Commissioner has taken

---

[1] Income Tax Regs.

Sec. 1.61–2 Compensation for services, including fees, commissions, and similar items.

\*     "     \*     \*     \*     \*     \*

(*d*) *Compensation paid other than in cash*—(1) *In general.* If services are paid for other than in money, the fair market value of the property or services taken in payment must be included in income. If the services were rendered at a stipulated price, such price will be presumed to be the fair market value of the compensation received in the absence of evidence to the contrary.

[2] S.M. 3322, IV–1 C.B. 112 (1925) ; G.C.M. 932, VI–1 C.B. 241 (1927).

the position as to drillers of oil wells where the driller in consideration for drilling obtains an interest in the oil lease that the transaction does not result in an exchange of property but that the drilling merely increases the value of the property and there is no income tax on the value of the drillers' interest thus acquired. In 1941, this administrative policy was extended to include drillers, investors, and equipment dealers for use in developing the leased property in return for agreements to make stated payments out of a share of the oil.[3] In this latter ruling the judicial authority relied upon by the Commissioner is contained in *Palmer* v. *Bender*, 287 U.S. 551 (1933). The basic principle encompassed in this policy is that the character of the oil in place is a reservoir of the capital investments of the parties entitled to share under the agreement. The assignee relieves the assignor of a share of the risks, costs, and burdens of development and the assignee thereby obtains a capital asset. The interest assigned thereby is not income to the assignee but a capital investment and the contributor's costs are to be capitalized and not expensed. These agreements are often called sharing arrangements. The capital investment is recovered by way of depletion.

Petitioner, a consulting engineering service corporation, contends it is entitled to the same treatment as the driller, investor, and equipment dealer specifically mentioned in the ruling, *supra*. In other words, petitioner asserts that it rendered its services in the development of the oil property and that it received no taxable income when it received the oil interests assignment which is shown in our Findings of Fact but has simply made a contribution to the pool of capital invested in the oil in place. It might well be that the preliminary services which petitioner rendered to the owners of the Seay lease and for which it was paid $35,000 in cash would be classified as development costs, but it is not that $35,000 with which we are here concerned.

In its brief petitioner cites *Page Oil Co.*, 41 B.T.A. 952 (1940). In that case we held that the taxpayer, Page Oil Co., was not entitled to depreciate the cost of drilling water wells used to stimulate the production of its oil wells. At page 963 we said:

It is our opinion that the so-called "water wells" involved in this proceeding are sufficiently similar to oil wells to require the same tax treatment. A water well does not wear out with use as does physical machinery or a pipe line; it is drilled, cased and shot in the same manner as an oil well; and its sole value and function is to complement the oil well by causing the oil to concentrate in the area into which the oil well has been drilled. As such, we think, it is no more than a part of the oil well itself.

From our discussion which follows, it will clearly appear that we do not have any issue of depreciation in this proceeding as was the case in the issue just referred to and discussed in *Page Oil Co., supra.*

[3] G.C.M. 22730, 1941–1 C.B. 214.

The letter agreement of November 10, 1953, shows that the mineral interests assignment which is involved herein was to be assigned to petitioner for its services which were to be rendered *thereafter* (after November 10, 1953) in supervising the operation of the waterflood program and that seems to us to involve for the most part a production activity. The letter agreement contained the following provisions:

Our compensation for our services heretofore rendered is thirty-five thousand dollars ($35,000) for which we submit our bill herewith in accordance with our previous understanding with you.

Our compensation for our services hereafter to be rendered in accordance with the provisions hereof in this water flood operation shall be:

1. Sixty-five thousand dollars ($65,000), payable out of production as follows:

If and when the total proceeds from ⅛ of ⅞ of total flood oil production shall have amounted to $35,000, then commencing as of seven o'clock a.m. of the first day of the first calendar month next ensuing and each month thereafter in which there is flood oil production, we shall own and be entitled to receive the proceeds from the sale of ⅛ of ⅞ of such flood oil production until the total aggregate amount so received prior to any tax application shall equal $65,000, or until termination date (hereinbelow defined), whichever first occurs.

2. An overriding royalty interest as follows:

Effective if and when, in accordance with the foregoing, the production payment in the total amount of $65,000 has been paid to us or has accrued to our credit, we shall have and own as an overriding royalty, $\frac{1}{16}$ of ⅞ of flood oil production, which shall continue until termination date, which is hereinbelow defined.

Upon request, you will execute, acknowledge and deliver to us a proper, recordable instrument vesting in us the production payment and overriding royalty interest above set forth.

We conclude that the mineral interests assignment which petitioner received October 16, 1957, did not represent a capital investment in the Seay lease but it represented, to the extent of the fair market value thereof, compensation for services rendered and to be rendered by petitioner after November 10, 1953, in supervising the installation and operation of a waterflood program on the Seay lease for the owners thereof. We think this was largely a production activity and cannot be capitalized. We sustain respondent on this issue.

It has been stipulated by the parties as follows:

If the Commissioner did not err as alleged in paragraph 4(a) of the Amended Petition, Petitioner is entitled to an additional deduction on account of cost depletion in 1957 of $15,279.

Having held that the Commissioner did not err as alleged in paragraph 4(a) of the amended petition, it follows that in a recomputation of the deficiency under Rule 50, petitioner should be allowed an additional deduction of $15,279.

*Decision will be entered under Rule 50*