JAMES A. LEWIS ENGINEERING, INC., Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 20533.

United States Court of Appeals Fifth Circuit.

Dec. 15, 1964.

William E. Collins, Rust E. Reid, Dallas, Tex., for petitioner, Thompson, Knight, Wright & Simmons, Dallas, Tex., of counsel.

Ralph A. Muoio, Atty., Dept. of Justice, Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Atty., Dept. of Justice, Crane C. Hauser, Chief Counsel, Internal Revenue Service, Robert B. Alexander, Jr., Melva M. Graney, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before TUTTLE, Chief Judge, and BROWN and GEWIN, Circuit Judges.

TUTTLE, Chief Judge:

The petitioner here complains that the Tax Court erred in holding that they acquired their interest in certain oil producing property in 1957 rather than in some prior year and that such acquisition constituted taxable income to them.

The facts are not in dispute. Taxpayer was engaged in the business of petroleum engineering on a consulting basis. At the request of the operators of an oil and gas lease in Jefferson County, Oklahoma, known as the Seay lease, the taxpayer made a preliminary study and certain proposals with respect to installing a waterflood program on the lease. Such a program is a method of recovering oil from the present producing horizon by injecting water into the oiled sand in order to supplement the existing reservoir pressure. A comprehensive report concerning the feasibility of waterflood operations on the lease was completed by the taxpayer and delivered to the operators in 1953. The lease had been producing oil in commercial quantities under ordinary production methods for many years prior to 1953.

On November 10, 1953, the taxpayer mailed a letter to Continental Oil Company and J. B. Stoddard, two of the principal owners of the Seay lease. This letter which constituted the basic agreement of the parties was signed by the taxpayer and agreed to by Stoddard and Continental on November 23, 1953. It was finally agreed to by the last of the parties in 1956, the delay being occasioned by some intervening litigation with certain Indian tribes. This letter provided that: (1) taxpayer's services in connection with a waterflood operation would be supervisory only and limited to flood operation; (2) if and when Stoddard and Continental elected to proceed with a leasewide waterflood program, taxpayer would prepare an exhibit to be designated "Schedule A— Gross Primary Oil Production"; (3) if Schedule A was approved by the operators, all oil produced from the Seay lease in excess of primary oil production as projected on Schedule A, was to be called "flood oil production" for the purpose of the agreement; (4) compensation for taxpayer's services heretofore rendered was to be $35,000; and (5) compensation for taxpayer's services hereafter to be rendered was to be $65,000, payable out of production if and when the total proceeds from ⅛ of ⅞ of total flood production amounted to $35,000, then on the first day of the next month taxpayer was to own and be entitled to receive the proceeds from the sale of ⅛ of ⅞ of such flood oil production until the aggregate amount so received equalled $65,000. When the $65,000 oil payment had been paid taxpayer was then entitled to own an overriding royalty of ⅟₁₆ of ⅞ of the flood oil production until the termination date as defined by the letter agreement. The letter agreement also provided that:

"Upon request, you will execute, acknowledge and deliver to us a proper, recordable instrument vesting in us the production payment and overriding royalty interest above set forth."

In view of the fact that the construction of this provision just quoted presents one of the critical issues in the case, it is important to note that it was included at the conclusion of the provision respecting the payment of the compensation agreed to be paid. It followed physically after the provisions respecting the conditions under which the

added compensation in the nature of an oil payment of $65,000 would become due and payable, and after it would become clear that the taxpayer would be entitled to his overriding royalty of one sixteenth of seven eighths ($\frac{1}{16}$ of $\frac{7}{8}$) of the flood oil production.

Nothing was done with respect to the project until 1956 on account of the intervening litigation. In this year, however, the corporation commission of the State of Oklahoma notified the operators of the lease that they must dispose of salt water that was being produced on the lease in some manner other than by dumping it into the Red River. The operators decided to use the salt water in a pilot waterflood operation to determine whether or not the introduction of water into the producing formation would result in an increased oil recovery. The injection of water under the pilot operation, begun on May 1, 1956, resulted quickly in an increase in the production of oil and in October, 1956, there was beginning to be produced "waterflood production."

On November 9, 1956, the taxpayer mailed a letter to Stoddard and Continental with an attached exhibit entitled "Schedule A—Gross Primary Oil Production". At a meeting of the principal parties on December 17, 1956, the decline curve and primary production schedule attached to the letter were orally agreed to and it was agreed that the taxpayer would participate in production beginning January 1, 1957. Pursuant to this oral agreement, the letter of November 9, 1956, was executed by Continental on December 27, 1956, and

by the administrator of the Stoddard estate on February 22, 1957.

A full-scale waterflood program was installed under taxpayer's supervision in September, 1957. The $65,000 oil payment and the $\frac{1}{16}$ of $\frac{7}{8}$ overriding royalty were assigned to the taxpayer on October 16, 1957.

The fair market value of the oil payment and overriding royalty assigned to the taxpayer by this assignment in 1957 was $50,500. The Tax Court held this amount was includable in the taxpayer's gross income in 1957 as compensation for services under Section 61(a) (1) of the 1954 Code.[1]

■ The first contention made by the taxpayer is that the Tax Court erred in not determining that they had constructive receipt of the oil payment in 1953, the year the contract was entered into, or at least at sometime prior to 1957, the year in which the assignment was actually executed and delivered to them. This contention is based upon the paragraph of the 1953 letter which is quoted above, stating that upon request the owners of the lease would execute a recordable instrument vesting in the taxpayer the production payment and overriding royalty. Taxpayer contends that immediately upon the execution of the November 10, 1953 letter, it had the absolute right to require the execution and delivery of such recordable instrument. That, having this right, it in effect then had constructive receipt of the production payment because of its unqualified right to receive it. See Irish v. Commissioner, 3rd Cir., 129 F.2d 468, 2 Mertens Federal In-

1. This is the Gross Income Definition Section. It provides as follows:

"(a) *General Definition.*—Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items:

"(1) *Compensation for services,* including fees, commissions, and similar items."

The appropriate Treasury Regulation dealing with compensation for services

when paid other than in cash, is Section 1.61–2(d) as follows:

"(d) *Compensation paid other than in cash.*—(1) *In general.* If services are paid for other than in money, the fair market value of the property or services taken in payment must be included in income. If the services were rendered at a stipulated price, such price will be presumed to be the fair market value of the compensation received in the absence of evidence to the contrary." 26 C.F.R., Sec. 1.61–2

come Taxation, Sec. 10.01 (1961) and see Williams v. United States, 5th Cir., 219 F.2d 523. .Taxpayer also points to cases holding that an item accrues for purposes of taxation when all of the events have occurred that are necessary to fix the liabilities of the parties and to determine the amount of such liabilities whether the amount is ascertained or ascertainable.

The difficulty with this first proposition urged by the taxpayer is that it has incorrectly construed the letter agreement. We agree with the Tax Court that the proper construction of this agreement executed on November 10, 1953, would require that the taxpayer first have the determination by the owners of the lease to proceed with the full scale waterflood program before they were called upon or could be called upon to execute and deliver the assignment of the production payment. As is clearly indicated by the statement of the case set out above, this did not finally occur until 1957, as found by the Tax Court. Thus, there was no constructive receipt of the production payment until it was actually received in the tax year 1957.

▪▪ The next contention put forth by the taxpayer is that even though it may be found to have received the property known as a "production payment" in 1957 in return for the services which it was to perform, and had already performed, this was not taxable income because of a construction placed on the statutes dealing with depletability of income from mineral interests in 1941. This construction is expressed in GCM 22730, 1941–1 Cum.Bul. 214. So far as here relevant it reads:

"If the driller or equipment dealer is making an investment by which he acquires an economic interest in oil and gas in place, expenditures made by him represent capital expenditures returnable tax-free through the depletion allowance rather than by way of expense deduction, and the oil payment rights acquired do not represent payment in property for services rendered or supplies furnished."

Through this GCM, the Commissioner sought to delineate those persons entitled to claim an "economic interest in minerals in place." Among these are drillers and equipment dealers who contribute to the "pool of capital" used in the development of mineral wells by bearing the expense of drilling or supplying the necessary equipment. According to the GCM, these contributors cannot deduct such expenditures as ordinary and necessary business expenses; they must look to the statutory depletion allowance for the recoupment of their "investments."

It is the argument of the taxpayer that GCM 22730 has the effect of eliminating from taxable income, when received, the present value of all oil payment rights that may be transferred to any person whose contribution by way of services is an essential part of the development of the oil or gas lease. Although the GCM expressly mentions only drillers and equipment dealers, it is contended that engineers, geologists, and lawyers who perform services in return for a share of mineral production may make equally essential contributions to the pool of investment required to bring the property into production.

Unless a careful analysis of the reasons underlying the issuing of GCM 22730 compelled it, the Court would have great difficulty accepting a construction of the Code that would fly in the face of the general provisions of the tax laws to the effect that compensation for services must be returned as a part of gross income. Sec. 61(a) (1) (fn. 1, supra). In this case, however, it is not necessary to go behind the GCM to determine whether there is an exception for compensation in the form of an assignment of a depletable interest in oil for the engineering services performed by the petitioner. The taxpayer concedes, as it must, that it is entitled to prevail only if it received compensation in con-

nection with "the acquisition, exploration or development" of the Seay lease. The Tax Court based its denial of the petitioner's claim, that its receipt of oil interests in 1957 was nontaxable on the determination that the services performed were in the area of production rather than development.

As stated by the Tax Court:

"The purpose of the pilot water flood operation was to determine whether or not the introduction of water would result in an increased oil recovery from producing wells. A water flood program is a method of secondary recovery, the purpose of which is to provide additional energy to the reservoir rock and in turn increase the oil recovery from the rock. The program consists of the introduction of water into the underground reservoir or oil sand for the purpose of recovering additional oil. Water flooding is, therefore, a method for the recovery of oil in place from the present producing horizon. The water injections on the Seay lease, begun on May 1, 1956, by a pilot water flood operation, resulted quickly in an increase in the production of oil and in October, 1956, there was beginning to be produced 'water flood production.' "

The Court then concluded that the mineral interests assignment "represented, to the extent of the fair market value thereof, compensation for services rendered and to be rendered by petitioner after November 10, 1953, in supervising the installation and operation of a water flood program on the Seay lease for the owners thereof. We think this was largely a production activity and cannot be capitalized."

Although expert witnesses for the taxpayer and the Commissioner differed in their views as to whether the water flood program was a part of development or of production, there was ample basis for the Tax Court to conclude, as it did, that the services did not fall within the concept of development so fully treated of in GCM 22730. We conclude that in thus finding the Tax Court did not commit error.

The decision is affirmed.