HERBERT B. CLINE, JR., AND BRISY CLINE, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

JOHN C. CLINE AND MILDRED CLINE, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3517–75, 3518–75.   Filed March 7, 1977.

*Zane Grey Staker,* for the petitioners.
*Robert E. Touchton,* for the respondent.

OPINION

QUEALY, *Judge:* Respondent determined the following deficiencies in petitioners' Federal income taxes:

| Petitioners | Year | Deficiency |
| --- | --- | --- |
| Herbert B. and Brisy Cline | 1967 | $1,817.19 |
| | 1968 | 3,433.24 |
| | 1969 | 7,231.39 |
| | 1970 | 7,373.83 |
| | 1971 | 6,737.83 |

| John C. and Mildred Cline | 1967 | 3,843.27 |
| | 1968 | 4,258.55 |
| | 1969 | 7,954.55 |
| | 1970 | 6,475.06 |
| | 1971 | 6,476.27 |

The only issue remaining for decision is whether the royalty payments received by petitioners from Wolf Creek Collieries Co. during the years 1967 through 1971 are to be taxed as capital gains rather than ordinary income under section 631(c),[1] or in the alternative, sections 1202 and 1222.

All of the facts have been stipulated and those facts are so found.

Herbert B. Cline, Jr., and Brisy Cline, husband and wife, filed joint Federal income tax returns for the taxable years 1967, 1968, and 1969, with the Office of the Internal Revenue Service at Parkersburg, W. Va., for the taxable year 1970 at the Cincinnati Service Center, and for the taxable year 1971 at the Memphis Service Center. For all taxable years in issue, they kept their records and prepared their income tax returns on the cash basis method of accounting. On the date they filed their petition, they resided in Matewan, W. Va. Herbert B. Cline, Jr., was a corporate executive for Wolf Creek Collieries Co., Lovely, Ky., during the years in issue.

John C. Cline and Mildred Cline, husband and wife, filed joint Federal income tax returns for the taxable years 1967, 1968, and 1969, with the Office of the Internal Revenue Service at Louisville, Ky., for the taxable year 1970 at the Cincinnati Service Center, and for the taxable year 1971 at the Memphis Service Center. For all taxable years in issue, they kept their records and prepared their income tax returns on the cash basis method of accounting. On the date they filed their petition, they resided in Lovely, Ky. John C. Cline was a mine superintendent for Wolf Creek Collieries Co., Lovely, Ky., during the years in issue.

Herbert B. Cline, Jr., and John C. Cline will sometimes be referred to as petitioners.

On February 1, 1966, Wolf Creek Collieries Co. (hereinafter referred to as Wolf Creek) and the petitioners entered into a contract whereby Wolf Creek, in consideration of the special

---

[1] Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954.

efforts of the petitioners on behalf of Wolf Creek in connection with the procurement for Wolf Creek of certain coal leases, agreed to pay petitioners 7 cents per ton beginning January 1, 1967, on all coal mined from the leasehold estates of Wolf Creek which were to be "acquired by virtue of lease negotiations carried out and accomplished" by the petitioners on Wolf Creek's behalf. The contract was signed on behalf of Wolf Creek by John C. Cline, its president. Pursuant to that contract, petitioner acquired a royalty interest in the "York-Ratliff lease" entered into by Wolf Creek on September 3, 1966, and the "Dempsey lease" entered into by Wolf Creek on December 1, 1966.

On December 30, 1966, petitioners sold their stock in Wolf Creek, totaling 666⅔ shares, to another corporation for the sum of $750,000. Petitioners owned no stock or other equity in Wolf Creek after December 30, 1966. In the negotiation for the sale of their stock in Wolf Creek, petitioners were concerned over the fact that the sale of such stock would deprive them of any future control over that corporation's development of the coal leases in which petitioners had royalty interests under the contract of February 1, 1966. This lack of control would enable Wolf Creek to avoid the payment to petitioners of tonnage royalties by mining the coal from leases other than those covered by that contract.

On December 30, 1966, petitioners thereupon entered into a second contract with Wolf Creek whereby the petitioners purported to "bargain, sell, grant and convey to Wolf Creek" the interest of the petitioners under the contract of February 1, 1966. In consideration therefor, Wolf Creek was obligated to pay a royalty of 5 cents per ton for each ton of coal loaded or processed through Wolf Creek's loading docks or tippling facilities for sale on the open market. This royalty applied to all coal handled by Wolf Creek, regardless whether mined by Wolf Creek or purchased from other sources.

The contracts dated February 1, 1966, and December 30, 1966, could not be valued at their dates of execution because the royalty payments to be received each year were dependent on the amount of coal mined and the amount of coal which passed over the tipples, all of which were dependent upon the conditions of the coal market.

After January 1, 1967, and throughout the taxable years in issue, each of the petitioners received certain royalty payments under the contract of December 30, 1966, at the rates of 2.5 cents per ton of Wolf Creek's gross production. Petitioners reported these payments as long-term capital gain.

In their notices of deficiency, the respondent determined that the payments received by petitioners pursuant to the contract of December 30, 1966, constituted ordinary income. With respect to the portion of such payments allocable to coal mined by Wolf Creek on its leases, respondent further determined that such payments were subject to the allowance of percentage depletion. With respect to the payments allocable to purchased coal, no percentage depletion was allowed.[2]

Petitioners contend that the contract of December 30, 1966, constituted a sale or disposal of the economic interest in the coal leases which they had acquired by the contract of February 1, 1966, with a retained interest in such coal, thereby qualifying the royalties received for capital gain under section 631(c).[3]

---

[2] Par. 5.D. of respondent's answer sets forth his position, as follows:

"[Respondent] Admits that in the filing of their federal income tax returns for the taxable years 1967, 1968, 1969, 1970 and 1971, petitioners availed themselves of the benefits of capital gains treatment under the United States Internal Revenue Code on the amounts received from Colleries under the agreement dated December 30, 1966, in each of those years and that the Commissioner in his examination of petitioner's income tax returns denied petitioners the benefits of such capital gains treatment asserting that a portion of such amounts received from Colleries were coal royalties subject to a depletion deduction of 10%, and that the remaining portions of such royalties were paid to petitioners on coal purchased and loaded over Colleries' tipple, but not mined from its leaseholds, and that such latter portions of royalties were not in fact coal royalties subject to depletion but ordinary income undiminished by any deduction, and thus taxable to petitioners in its entirety; denies the remaining allegations of paragraph 5.D. of the petition. [Reproduced literally.]"

[3] Insofar as material herein, sec. 631(c) provides:

SEC. 631. GAIN OR LOSS IN THE CASE OF TIMBER, COAL, OR DOMESTIC IRON ORE.

(c) DISPOSAL OF COAL OR DOMESTIC IRON ORE WITH A RETAINED ECONOMIC INTEREST.—In the case of the disposal of coal (including lignite), * * * mined in the United States, held for more than 6 months before such disposal, by the owner thereof under any form of contract by virtue of which such owner retains an economic interest in such coal * * * the difference between the amount realized from the disposal of such coal * * * and the adjusted depletion basis thereof plus the deductions disallowed for the taxable year under section 272 shall be considered as though it were a gain or loss, as the case may be, on the sale of such coal * * *. Such owner shall not be entitled to the allowance for percentage depletion provided in section 613 with respect to such coal * * *. This subsection shall not apply to income

Alternatively, petitioners contend that the economic interest created by the first contract was a capital asset which they held for more than 6 months. As such, the profit derived from the purported "sale" of such asset on December 30, 1966, represented long-term capital gain.

Under the contract of February 1, 1966, petitioners were to receive royalty interests in certain coal leases which they negotiated on behalf of Wolf Creek. Such leases were, in fact, entered into under the designation of the "York-Ratliff lease" on September 3, 1966, and the "Dempsey lease" on December 1, 1966.

At the outset, it must be decided whether petitioners thereby acquired an economic interest in the coal to be mined from those leases. G.C.M. 22730, 1941–1 C.B. 214. This in turn depends upon whether the petitioners are to be regarded as having contributed their services to the venture thereby acquiring a capital interest therein, or whether the petitioners are to be regarded as having received an agreed royalty as "salary" for such services. See *Garrett v. Campbell*, 360 F.2d 382, 384 (5th Cir. 1966). Once the leases were acquired, no further services were required of petitioners. See *James A. Lewis Engineering, Inc.*, 39 T.C. 482 (1962), affd. 339 F.2d 706 (5th Cir. 1964). In fact, the notices of deficiency seemingly concede that petitioners had an economic interest in the coal properties operated by Wolf Creek both by virtue of the agreement of February 1, 1966, and subsequently by virtue of the agreement of December 30, 1966. The respondent has allowed percentage depletion on account of petitioners' royalties in coal produced from these leases. Cf. *Paragon Coal Co. v. Commissioner*, 380 U.S. 624 (1965).

As part of the negotiation which resulted in the sale by petitioners of the stock of Wolf Creek pursuant to a contract dated December 30, 1966, petitioners entered into a new contract with Wolf Creek pursuant to which petitioners gave up their right to receive 7 cents per ton for the coal mined from the specific leases covered by the contract of February 1, 1966, for the right to receive 5 cents per ton for all coal loaded

---

realized by any owner as a co-adventurer, partner, or principal in the mining of such coal * * * and the word "owner" means any person who owns an economic interest in coal * * * in place, including a sublessor. The date of disposal of such coal * * * shall be deemed to be the date such coal * * * is mined. * * *

or processed through Wolf Creek's loading docks or tippling loading facilities from *whatever source acquired.* Respondent argues that the new contract did not affect petitioners' interest in the coal property but merely provided a different formula to compute the amounts due petitioners on account of that interest.

It must be recognized that under the agreement of February 1, 1966, petitioners acquired an economic interest in certain coal leases. That interest entitled petitioners to share in the proceeds of the property to the extent of 7 cents per ton for each ton of coal mined so long as coal was mined from these properties and no longer. On the other hand, under the agreement of December 30, 1966, petitioners acquired the right to receive 5 cents per ton for all coal loaded or processed through Wolf Creek's facilities, whether mined by Wolf Creek or purchased in the open market. The petitioners' right to receive a "royalty" on all the coal handled by Wolf Creek thus was not dependent upon the extraction of coal from any specific lease or leases. Such right did not give petitioners an economic interest in any coal property. *Commissioner v. Southwest Expl. Co.,* 350 U.S. 308, 314 (1956); *Palmer v. Bender,* 287 U.S. 551, 557 (1933); see also *Earl Vest,* 57 T.C. 128 (1971), revd. in part 481 F.2d 238 (5th Cir. 1973).

As we view the transaction, petitioners must be deemed to have exchanged the economic interest which they acquired in the coal lease under the agreement of February 1, 1966, for a payment measured by the amount of coal handled by Wolf Creek regardless of its source. Petitioners exchanged an economic interest for "something else." *Don C. Day,* 54 T.C. 1417 (1970).

Notwithstanding the fact that respondent had allowed percentage depletion on account of certain payments under the contract of December 30, 1966, the transfer of the petitioners' interest under the contract of February 1, 1966, in exchange for the payments to be received under the subsequent contract did not constitute the disposal of an interest in coal with a retained economic interest within the meaning of section 631(c). The petitioners gave up their economic interest in exchange for the right to receive a payment on account of all coal handled by Wolf Creek *regardless of source.*

Nonetheless, since the Court has concluded that the contract of December 30, 1966, constituted a sale or exchange of petitioners' right under the contract of February 1, 1966, consistency would require that such transaction be treated as a sale or exchange of a capital asset. It is axiomatic that the royalty interest constitutes a capital asset in the hands of its owners. *Palmer v. Bender, supra.* The outright sale of the royalty results in a capital gain. In this case, however, the royalty with respect to the York-Ratliff lease could not have been acquired prior to September 3, 1966. The royalty with respect to the Dempsey lease could not have been acquired prior to December 1, 1966. As of December 30, 1966, neither interest had been held by petitioners for a period of more than 6 months. Accordingly, the payments received by petitioners from the sale or exchange of such royalties are taxable as a gain from the sale or exchange of a capital asset held for less than 6 months.

*Decisions will be entered under Rule 155.*

Reviewed by the Court.

TANNENWALD, *J.*, dissenting: I cannot escape the conclusion that petitioners herein simply received royalty income representing compensation for services. Assuming, for the purposes of decision, that the right which they received under the February 1, 1966, agreement constituted "property" sufficient to support their claim of an economic interest for purposes of depletion (an issue which respondent concedes and we are therefore not called upon to decide), it does not necessarily follow that such property constituted a capital asset for purposes of determining the nature of the income which they subsequently derived therefrom. Cf. *H. B. Zachry Co.*, 49 T.C. 73, 80 n. 5 (1967), where we indicated that, although a carved-out oil payment was "property" for purposes of section 351, the transferor might still remain taxable on the payments when received under the principle established by *Commissioner v. P. G. Lake, Inc.*, 356 U.S. 260 (1958). See Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders 3–12, 3–13 (3d ed. 1971). See also Miller, Oil & Gas Federal Income Taxation 18–25 (1976 ed.).

Similarly, while I recognize that property received as compensation for services, the value of which at the time of receipt is considered ordinary income, can on occasion be considered a capital asset, I am not convinced that such a result follows where, as is the case herein, that property cannot be valued at the time of receipt. In *Ford S. Worthy, Jr.,* 62 T.C. 303 (1974), the taxpayer received stock which did not have a readily ascertainable fair market value at the time of receipt. The stock was subsequently redeemed and the question before us was whether the taxpayer realized ordinary income or capital gain therefrom. We held that the proceeds of the redemption constituted compensation for personal services and should be treated as ordinary income. We reached the same result, under section 1.421–6, Income Tax Regs., where warrants instead of stock were received. *Frank L. Shamburger,* 61 T.C. 85 (1973), affd. per curiam 508 F.2d 883 (8th Cir. 1975). See also sec. 1.61–15, Income Tax Regs. It seems to me that both *Worthy* and *Shamburger* furnish a useful analogy for resolving the question before us. A further analogy can be found in *United States v. Frazell,* 335 F.2d 487 (5th Cir. 1964), on rehearing 339 F.2d 885 (5th Cir. 1964), where the court held that the fact that the taxpayer had received a partnership interest for services did not preclude a holding that the subsequent substitution of corporate stock for that interest gave rise to ordinary income. Cf. *Vestal v. United States,* 498 F.2d 487 (8th Cir. 1974), rehearing denied 498 F.2d 495 (8th Cir. 1974).[1]

In my view, petitioners' right to royalties under the February 1, 1966, agreement (which the parties herein concede was incapable of being valued at that time) was not a capital asset, with the result that the royalties received thereunder (or in substitution therefor under the December 30, 1966, agreement) should be treated as ordinary income representing compensation for services. In this connection, I should add that, even if the right to royalties created by the February 1, 1966, agreement were treated as a capital asset,

---

[1] It cannot be gainsaid that the proper treatment of transactions such as are involved herein has had a murky history, stemming in large part from G.C.M. 22730, 1941–1 C.B. 214. See *James A. Lewis Engineering, Inc. v. Commissioner,* 339 F.2d 706 (5th Cir. 1964), affg. 39 T.C. 482 (1962); Miller, Oil & Gas Federal Income Taxation 18–25 (1976 ed.).

the December 30, 1966, agreement represented no more than a modification of the earlier agreement in respect of *the measure of payment* and did not constitute a sale or exchange of that right sufficient to justify treating the royalties subsequently received as capital gain.

RAUM, SIMPSON, and WILBUR, *JJ.*, agree with this dissent.