WILLIAM H. ZUHONE, JR., AND AUDRA M. ZUHONE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Zuhone v. Commissioner
Docket No. 44373-85.
United States Tax Court
T.C. Memo 1988-142; 1988 Tax Ct. Memo LEXIS 172; 55 T.C.M. (CCH) 533; T.C.M. (RIA) 88142; 100 Oil & Gas Rep. 635; April 6, 1988; As Amended April 7, 1988 *172 H. Kent Heller, for the petitioners. Clinton M. Fried, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined the following deficiencies in and additions to petitioner's Federal income tax: Additions to Tax
Year
Deficiency
Sec. 6653(a)(1) [1]
Sec. 6653(a)(2)
1975
$ 483,738.95
1976
3,128.78
1977
11,371.43
1978
32,342.04
1979
242,396.32
1980
14,207,43
1981
131,171.00
$ 6,743.00
*
1982
2,376.00
After concessions, the issues for decisions are (1) whether certain overriding royalty *173 interests in oil and gas wells must be included in petitioners' 1975 and 1976 taxable income and, if so, (2) the value of such interests. FINDINGS OF FACT Some of the facts have been stipulated, and the facts set forth in the stipulation are incorporated in our findings by this reference. William H. ZuHone (petitioner) and Audra M. ZuHone resided in Mattoon, Illinois, when their petition was filed. Petitioner was president and sole shareholder of W. Wilmar Oil, Inc. (Wilmar Oil) and Wilmar Petroleum Company (Wilmar Petroleum). Each corporation sold and promoted drilling ventures. At the time of trial, petitioner had been employed in the oil and gas business for 30 years. Petitioner has drilled approximately 250 wells. In 1972, petitioner paid approximately $ 300,000 for a 5,000 acre block of oil and gas leases in Texas. At the time of the purchase, there was no development on any of the leases within the 5,000 acre block. In 1975 and 1976, Wilmar Oil and Wilmar Petroleum sold fractional working interests in the leases purchased by petitioner in 1972. Wilmar Oil and Wilmar Petroleum filed Schedule D prospectuses with the Securities and Exchange Commission (SEC). These *174 documents state that each investor would pay a fixed sum in return for an interest in a well drilled to a specified depth in a designated location. Each investor also would be required to pay his or her share of the cost of operating a producing well. The working interests promoted by petitioner and his corporations were thus of the turnkey variety. Wilmar Oil and Wilmar Petroleum undertook for a fixed price to furnish all labor and supplies and perform all work required to complete a well, place it in production, and turn it over ready to "turn the key" and start oil running into the tanks. Petitioner planned to make a profit by selling fractional interests at a price that exceeded his total costs of acquiring the lease and drilling the well. Petitioner's activities in 1975 and 1976 were for the benefit of Wilmar Oil and Wilmar Petroleum; at no time did petitioner sell working interests in the leases for his own account. As part of petitioner's compensation from Wilmar Oil and Wilmar Petroleum, petitioner received overriding royalty interests in the drilling sites. Petitioner was the recipient of overriding royalty interests in the following named properties by assignment *175 from Wilmar Oil Company or Wilmar Petroleum, each having a value as indicated below: Property
Assignment
Size of
Name
Date
Override (%)
Value
Keechi Creek #1
7-24-75
10.9375 $ 68,474
Henderson Lease #1
8-14-75
10.9375 68,474
Wimberly Estate A
9-14-76
3.4375 23,648
Dorris Lake Williams
1-28-76
2.8125 17,608
Samuels #1 *
8-14-75
3.4375 69,301
Samuels #2 *
8-14-75
10.9375 33,539
Samuels #3 *
8-14-75
10.9375 39,816
Samuels #4
8-14-75
10.9375 41,178
Samuels #5
8-14-75
10.9375 41,178
Samuels #6
8-14-75
10.9375 41,178
Samuels #7
8-14-75
10.9375 41,178
Samuels #8
8-14-75
10.9375 41,178
Ash #1
8-14-75
10.9375 20,066
Ash #2
8-14-75
10.9375 42,578
Browder #1 *
8-14-75
10.9375 10,413
Hering #1 *
8-14-75
10.9375 54,747
Keith *
8-14-75
10.9375 17,985
Thompson #1
10-27-75
5.46875
32,230
Fojtik &
8-14-75
3.125  11,594
Zimmerman
In notices of deficiency, respondent determined that petitioner had failed to include the value of the overriding royalty interests in his 1975 *176 and 1976 taxable income. OPINION Section 83 generally provides that the fair market value of property received in exchange for services must be included in income. Respondent consequently argues that petitioner recognized taxable income on receipt of the overriding royalty interests. Petitioners have the burden of proving that respondent's determination is erroneous. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.
Petitioner relies on the so-called "pool of capital" doctrine, a narrowly drawn nonstatutory exception to the rule set forth in section 83. The exception, which was first discussed in General Counsel Memorandum 22730, 1941-1 C.B. 214, generally applies when services or property are contributed toward the acquisition, exploration, or development of an oil and gas well properties and an "economic interest" in the well is received in return. The contours of the doctrine are not clearly defined. *177 In Rev. Rul. 77-176, 1977-1 C.B. 77, the Commissioner stated that the pool of capital doctrine, set forth in G.C.M. 22730, applies when drillers, equipment suppliers, and investors contribute materials or services to the development of mineral property in exchange for an economic interest in such property. In his brief, respondent cites this ruling as evidence of respondent's view that the doctrine remains vital "where all of the G.C.M.'s essential requirements are met." Revenue rulings are not authority binding on this Court, but they may, in certain circumstances, constitute an admission or concession by the Commissioner. See Silco, Inc. v. United States,779 F.2d 282, 287 (5th Cir. 1986); Haley Bros. Construction Co. v. Commissioner,87 T.C. 498, 516-517 (1986). Petitioner have fashioned their legal argument in this case by relying in large measure upon an article entitled "Assignment of an Economic Interest for Personal Services," 1 Oil and Gas Tax Quarterly at 172 (1952). *178 This 35-year-old journal article enumerates some six separate factors which should be present in order for the pooling of capital doctrine to apply to the rendering of personal services: a. It must be agreed and pre-arranged between the parties that the services are contributed and that the contributor is to receive a share right in production, marked by the assignment of an economic interest to him, in return for his contribution. b. The services contributed may not effect a substitution of capital, rather, they must add to the pool of capital already invested in the oil and gas in place. c. The contribution must perform a function necessary to bringing the property into production or augment the pool of capital already invested in oil and gas in place. d. The contribution must be specific to the properties in which the economic interest is acquired. e. The contribution must be definite and determinable. f. The contributor must look only to the economic interest acquired for his "possibility of profit." Other authors have likewise discussed the characteristics that have been derived from G.C.M 22730 and the relatively small number of actual cases *179 addressing the pool of capital doctrine. See generally, Schwidetzky, "The Pool of Capital Doctrine: A Peace Proposal," 61 Tulane Law Review 519 (1987); Parker, "Contribution of Services of the Pool of Capital: General Counsel Memorandum 22730 to Revenue Ruling 83-46," 35 Inst. on Oil & Gas L. & Tax'n 313 (1984); Burke, "How Should an Economic Interest Acquired for Services to Treated After Revenue Ruling 83-46," 58 J. Tax'n 352 (1983); Galvin, "G.C.M. 22730 -- Twenty-Five Years Later," 19 Inst. on Oil & Gas L. & Tax'n 511 (1967). The pool of capital doctrine has been the subject of judicial criticism, James A. Lewis Engineering, Inc. v. Commissioner,339 F.2d 706, 709 (5th Cir. 1964), affg. 39 T.C. 482 (1962), but reports of its demise are at least slightly exaggerated. See Cline v. Commissioner,67 T.C. 889, 893 (1977), affd. 617 F.2d 192 (6th Cir. 1980). On this record, we need not further examine the "murky history" of G.C.M. 22730. Cline v. Commissioner,67 T.C. at 896 n.1 (Tannenwald, J., dissenting). Assuming, without deciding, *180 that the "pool of capital doctrine" exists and that the 1952 Oil and Gas Quarterly article relied on by petitioner accurately describes the doctrine's nature and extent, we conclude that petitioner has failed to satisfy his burden of proof. As to the necessity of a prearranged agreement (factor a on petitioner's list), petitioner has freely admitted that he never entered into any written agreement with any of his controlled corporations specifying the services he was to provide in return for each overriding royalty interest. Petitioner maintains that the Schedules D filed with the Securities and Exchange Commission constitute prearranged agreements for purposes of the pool of capital doctrine. According to the Schedules D, the offerors and operators of each well were Wilmar Petroleum and Wilmar Oil, not petitioner, and it is the corporate entities, not petitioner, that were obligated under the terms of these documents. Next, petitioner contends that this services constituted a contribution to the pool of capital invested in the oil and gas in place, rather than a substitution of capital. (Factor b.) Petitioner did not invest in the oil and gas in place. The risk of these ventures *181 rested with the investors, who purchased working interests in the wells promoted by petitioner. Petitioner's operations were of the "turnkey" variety; if the wells drilled turned out to be nonproducing, petitioner would derive a profit from the venture based upon the difference between the amount received from the investors and petitioner's actual expenses. Any production that occurred only served to increase his potential profit. Petitioner also fails to satisfy the third element (factor c) discussed in the Oil and Gas Tax Quarterly article: the requirement that services rendered be necessary to bring the property into production, or augment the pool of capital already in place. The express terms of G.C.M. 22730 relate to acquisition, exploration, or production activities. This Court and the Court of Appeals for the Fifth Circuit have decided that post-production activities do not quality for pooling of capital treatment. James A. Lewis Engineering, Inc. v. Commissioner, supra.Samuels lease Nos. 1, 2, and 3, Ash No. 1, Browder lease No. 1, Hering lease *182 No. 1, and Keith lease were all producing wells when the overriding royalty interests were assigned to petitioner. Petitioner has not shown that his contributions "were specific to the properties in which he acquired the interest." (Factor d.) Petitioner must establish what work was performed for each interest received on a property by property basis. This he has failed to do. Petitioner's contribution of services was anything but "definite and determinable." (Factor e.) Again, all services provided by petitioner were for the benefit of his corporations. Petitioner claims that "the contribution is spelled out in Schedule D." No reading of the Schedules D reveals the exact extent or nature of petitioner's contributions to the development of any specific property. Finally, petitioner has failed to prove that he looked only to the economic interest acquired for the possibility of deriving a profit. (Factor f.) In each of the drilling ventures promoted by petitioner, the investors who purchased fractional working interests bore the risk of nondiscovery. Petitioner anticipated making a profit by selling fractional interests at a price that exceeded his total costs of acquiring *183 the lease and drilling the well. For the foregoing reasons, petitioner must include the fair market value of the overriding royalty interest received from Wilmar Oil and Wilmar Petroleum in his 1975 and 1976 taxable income. Thus, we must determine the fair market value of those interests. Fair market value is defined as the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of all relevant facts. United States v. Cartwright,411 U.S. 546, 551 (1973). Fair market value is a question of fact, and the trier of fact must weigh all relevant evidence and draw appropriate inferences. Hamm v. Commissioner,325 F.2d 934, 938 (8th Cir. 1963), affg. a Memorandum Opinion of this Court. Again, petitioners bear the burden of proof. Petitioner has failed to carry this burden. In lieu of producing evidence of the fair market value of the overriding royalty interests, petitioner makes *184 broadside attacks on the methodology and qualifications of respondent's expert witness. Such attacks are not a substitute for proof. See Rules 143(b) and 149(b), Tax Court Rules of Practice and Procedure. Petitioner's testimony concerning the value of the overriding royalty interests was vague, uncorroborated, and wholly unpersuasive. He merely asserted that the interest could not be accurately valued. Difficulty, however, does not excuse the necessity of proof. The record contains no evidence that would persuade us that the fair market value of petitioner's interests was less than that determined by respondent. Petitioner further argues that the report of respondent's expert witness must be stricken from the record because it was "based on facts and information which became known after the date of the transaction." We reiterate that petitioner, not respondent, bears the burden of proof, and because petitioner has presented no persuasive evidence of value, acceptance of petitioner's argument would not [Text Deleted by Court Emendation] affect the outcome of this case. Moreover, as *185 to the expert's valuation of petitioner's interests in leases that were not producing on the date of assignment, petitioner's objection is unpersuasive. Respondent's expert valued the overriding royalty interests in those leases by applying a multiplier to the prices of the working interests as set forth in petitioner's Schedules D. Although we might quarrel with the details of respondent's expert report, we conclude that it is the only evidence of the fair market value of the interests that can be given any weight. To reflect the concessions of the parties, Decision will be entered under Rule 155.
Footnotes
1. All sections references are to the Internal Revenue Code as amended and in effect during the years in issue, except as otherwise noted.↩
*. 50 percent of the interest on $ 52,386. ↩
*. Those properties with asterisks were producing at the time of assignment ↩