**William H. ZUHONE, Jr. and Audra M. Zuhone, Petitioners–Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.**

No. 88–2248.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 10, 1989.

Decided Aug. 28, 1989.

H. Kent Heller, Naperville, Ill., for petitioners-appellants.

Gary R. Allen, William S. Rose, Jr., Asst. Atty. Gen., Dept. of Justice, Tax Div., Appellate Section, William F. Nelson, I.R.S., Charles Bricken, David I. Pincus, Dept. of Justice, Tax Div., Washington, D.C., for respondent-appellee.

Before CUMMINGS, CUDAHY and FLAUM, Circuit Judges.

CUMMINGS, Circuit Judge.

Petitioners William H. Zuhone, Jr. and his wife Audra have appealed from a decision of the Tax Court holding that there was a deficiency in income tax amounting to $467,746.91 for 1975 (App. A15). The Tax Court held that certain overriding royalty interests in oil and gas wells must be included in petitioners' 1975 and 1976 taxable income [1] and also accepted the evaluation of those interests supplied by the Commissioner's expert. The propriety of these two rulings is now before us.[2] We affirm.

I. Propriety of Income Tax Treatment of Taxpayer's Royalty Interests

When taxpayer [3] filed his petition in the Tax Court, he resided in Mattoon, Illinois. He was an independent oil producer and the president and sole stockholder (except for directors' qualifying shares) of W. Wilmar Oil, Inc. (Wilmar Oil) and Wilmar Petroleum Company (Wilmar Petroleum). Those corporations were in the business of promoting and selling drilling ventures.

In 1972, taxpayer bought for Wilmar Oil an overriding royalty interest [4] in 5,000 acres of land in two Texas counties including the operating mineral leases on that land. Both Wilmar Oil and Wilmar Petroleum promoted and sold drilling ventures consisting of fractional working interests in the oil leases on that property. The two corporations agreed to furnish all labor and supplies and to perform the work required to complete a well and place it in production. Each investor in the Wilmar offerings received a working interest in a well ready to start production. In return the investors paid Wilmar a fractional share of (1) the drilling costs, (2) the cost of readying a producing well for commercial production, and (3) the cost of operating a producing well.

The owner of the land subject to the leases retained a royalty interest of ⅛ of production and Wilmar Oil, the owner of the mineral rights lease, retained an overriding royalty of ⅛ of the remaining ⅞ of the mineral production. The remaining ⅞ of ⅞ of the mineral interest was divided into 64 equal parts, 40 of which were offered to the public by Wilmar Oil. The remaining 24 of the 64 parts were to be granted to taxpayer, Wilmar Oil salesmen, or retained by Wilmar Oil. The 40 fractional working interests were to be sold at a price that would yield a profit over Wilmar Oil's lease acquisition and drilling costs even if a dry hole resulted. Taxpayer received overriding royalty interests in various properties by assignment from Wilmar Oil as part of his compensation from the Wilmar companies. In September 1985, the Commissioner sent taxpayer a notice of deficiency for the overriding royalty interests conveyed to taxpayer in the amount of

---

1. While 1976 was also involved, the Tax Court decided there had been an overpayment of $520.08 for that year (App. A18).

2. The Tax Court's opinion is reported in Tax Court Mem. Dec. (P–H) par. 88,142 (1988) but at least not thus far in T.C.

3. Throughout this opinion, the term "taxpayer" also refers to Mrs. Zuhone because she and her husband filed joint income tax returns during the years in question.

4. An overriding royalty interest is a right to share in the production value of mineral rights leased from the owner of land without any obligation for the cost of exploration or development of the land. 17 C.F.R. § 230.300(a). In contrast, the holder of a working interest must pay for the cost of production to share in its value.

$483,738.95 for 1975 and $3,128.78 for 1976, the only years involved in this appeal.

Taxpayer does not contest the general rule that compensation for services is gross income to the service provider. When that compensation is in the form of unrestricted property, the fair market value of the property at the time it is transferred is ordinarily includible in the taxpayer's income. It is the Commissioner's position that Mr. Zuhone received overriding royalty interests as part of his compensation for rendering services to Wilmar Oil and Wilmar Petroleum companies.

■ To avoid taxation upon his receipt of these overriding royalty interests, taxpayer depends entirely upon the "pool of capital" doctrine first acknowledged by the government in a 1941 memorandum opinion of the then Chief Counsel of the Bureau of Internal Revenue. This lengthy opinion covers the tax implications of many hypothetical oil and gas leasing situations, but taxpayer seemingly relies only on the following excerpt:[5]

> By such arrangements [as involved here], a lessee commonly lessens his own investment and the risks and burdens attending the development by agreements to share the investment obligation and the proceeds of production. The lessee or assignee, like the lessor or assignor who retained a share interest in production having a value equivalent to that of the lessor's prior interest but passed on to the lessee the investment obligations and risks that attend development for a share in production, has parted with no capital interest but has merely in turn given another a right to share in production in consideration of an investment made by such other person. If the driller or equipment dealer is making an investment by which he acquires an economic interest in oil and gas in place,

expenditures made by him represent capital expenditures returnable tax-free through the depletion allowance rather than by way of expense deduction, and the oil payment rights acquired do not represent payment in property for services rendered or supplies furnished. Similarly, one who, in return for an oil payment right, furnishes money which the lessee is pledged to use in developing the property would be regarded as making an investment representing an addition to the reservoir of capital investments in oil and gas in place * * *.

GCM 22730, reported in 1941–1 C.B. 214, 221–222.[6] The "pool of capital" principle allows a taxpayer who contributes development property or services to the "pool of capital" in establishing an oil or gas well to retain or receive an interest therein without having to pay income tax at the time of receipt. Instead, the proceeds of the interest, subject to depletion, are taxable on receipt. Taxpayer contends that his involvement in development of the wells at issue was such a contribution to capital rather than services performed for the receipt of overriding royalty interests in the wells.

■ Although the pool of capital doctrine has engendered several articles, it has received little treatment by the courts or Commissioner. Prior to its recognition by the Bureau of Internal Revenue, a pool of capital concept was merely alluded to by various courts predominantly under the reasoning that an economic interest in a mineral interest during the exploration and development stage may be too speculative to value at the time of its receipt. In *Burnet v. Harmel*, 287 U.S. 103, 53 S.Ct. 74, 77 L.Ed. 199, the Court determined that cash bonuses and production royalties received for leases of land for oil and gas exploration constituted ordinary income subject to depletion allowances. The Court

---

**5.** Taxpayer's reply brief quotes another part of this memorandum opinion concerning depletion allowances (Reply Br. 3–4).

**6.** See also Schwidetzky, *The Pool of Capital Doctrine: A Peace Proposal,* 61 Tulane L.Rev. 579 (1987); Parker, *Contribution of Services to the Pool Capital: General Counsel Memorandum*

*22730 to Revenue Ruling 83–46,* 19 Inst. on Oil & Gas L. & Tax'n 315 (1984); Burke, *How Should an Economic Interest Acquired for Services Be Treated After Revenue Ruling 83–46?,* 58 J. Tax'n 352 (1983); Galvin, *G.C.M. 22730—Twenty–Five Years Later,* 18 Inst. on Oil & Gas L. & Tax'n 511 (1967).

referred to the economic interest as an interest that could only be recovered out of production rather than from sale of the property. Also, in *Palmer v. Bender,* 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489, the Court held that the transfer of bonuses and future royalty payments in exchange for oil and gas leases was not a sale, but a subleasing transaction entitling the taxpayer to depletion deductions. In so holding the Court reasoned that the critical issue in determining taxation is whether the taxpayer "has acquired, by investment, any interest in the oil in place, and secures, by any form of legal relationship, income derived from the extraction of the oil, to which he must look for a return of his capital." *Palmer,* 287 U.S. at 557, 53 S.Ct. at 226. See also *Transcalifornia Oil Co. v. Commissioner,* 37 B.T.A. 119 (1938), and *Laster v. Commissioner,* 43 B.T.A. 159 (1940), affirmed in part and reversed in part, 128 F.2d 4 (5th Cir.1942), where the Tax Court held that the sale of shares in future recovery of minerals was not a taxable event since the funds received were to be used for drilling. In a series of similar cases, the Fifth Circuit has declined to tax the recipient of an economic interest in future oil payments at the time of receipt due to the uncertainty and contingency of its value. *Commissioner v. Edwards Drilling Co.,* 95 F.2d 719 (5th Cir.1938); *Dearing v. Commissioner,* 102 F.2d 91 (5th Cir.1939); *Lee v. Commissioner,* 126 F.2d 825 (5th Cir.1942).

Following the issuance of GCM 22730, the Fifth Circuit had an opportunity to readdress the pool of capital doctrine in *United States v. Frazell,* 335 F.2d 487 (5th Cir.1964), where the taxpayer, a geologist, received a future mineral interest in properties he recommended to be acquired and developed by two investors. Immediately prior to the vesting of the geologist's interests, the properties were transferred to a corporation with the taxpayer receiving a percentage of the stock. The court held that the taxpayer received income when his interests vested in an amount equal to the value of the stock.

Later that year the Fifth Circuit decided *James A. Lewis Engineering, Inc. v. Com-*

*missioner,* 339 F.2d 706, 709 (1964), where the petitioner made the same argument as taxpayer here. Chief Judge Tuttle observed that the court "would have great difficulty accepting a construction of the Code [in GCM 22730] that would fly in the face of the general provisions of the tax laws to the effect that compensation for services must be returned as a part of gross income." However, the court found it unnecessary to pass upon the validity of GCM 22730 since it determined that the services performed by taxpayer were not development activities related to the acquisition and exploration of the mineral interest but were production activities that could not be capitalized. 339 F.2d at 709–710. The taxpayer there had conceded that the pool of capital doctrine applied only if the services performed were development rather than production activities.

Later in *Garrett v. Campbell,* 360 F.2d 382, 384 n. 3 (1966), the same Circuit avoided applying GCM 22730 because taxpayer Garrett had not raised any question or suggestion as to the application of that ruling. Stock received by Garrett, supposedly in exchange for mineral interests Garrett claimed to have received earlier as compensation for services, was found in a jury trial to be ordinary income within Section 61 of the Code, and the judgment of the district court was affirmed.

In regulations to the Tax Reform Act of 1969 the Internal Revenue Service added to the confusion surrounding the pool of capital doctrine in Treas.Reg. § 1.636–1(b) which provides that a production payment carved out in connection with the exploration and development of a mineral interest need not be included in gross income at the time of receipt of the production payment. However, immediately following, the regulation provides: "See section 83 and the regulations thereunder, relating to property transferred in connection with the performance of services."

Both the majority and dissenting opinions of the full Tax Court in *Cline v. Commissioner,* 67 T.C. 889, 893, 896 (1977), also avoided application of GCM 22730, mentioning it in passing only. Petitioners had ac-

quired by contract royalty interests in coal leases they had procured for the Wolf Creek Collieries Co. Under the first of two contracts with Wolf Creek the petitioners' royalties were limited to coal processed by Wolf Creek. The majority concluded in dicta that this gave petitioners an economic interest in the coal property, but stated that they had no such interest under a subsequent contract giving them royalties on all coal processed through Wolf Creek, including coal purchased on the open market. To be consistent, the majority concluded that both contracts must be viewed as involving capital assets and held that the royalties received were taxable as capital gains. The four dissenters thought that petitioners' property under the first contract was not a capital asset for income tax purposes and that the royalties under both contracts should be treated as ordinary income representing compensation for services. In a footnote, the dissenters blamed GCM 22730 for fostering a "murky history" in this field. 67 T.C. at 896 n. 1.

The Sixth Circuit did not mention GCM 22730 in reviewing the Tax Court's decision in *Cline v. Commissioner*, 617 F.2d 192 (1980). However, unlike the Tax Court, the court of appeals held that "the essential nature of the payments [to the Clines] was compensation for services, [so that] the Commissioner correctly treated the amounts received by the taxpayers as ordinary income" *Cline*, 617 F.2d at 195. To recapitulate, the federal appellate courts that have considered Mr. Zuhone's argument since GCM 22730 have upheld the Commissioner's determination that the interests received by the James A. Lewis Engineering Co., Garrett and the Clines constituted ordinary income.[7]

The continued vitality of the pool of capital doctrine was threatened by Rev.Rul. 83–46, 1983–1 Cum.Bull. 78, which examines three hypothetical examples: (1) a corporation which syndicates oil and gas partnerships receives oil and gas overriding royalty interests from a partnership it promoted as compensation for services in locating oil and gas properties; (2) a lawyer performs title searches and drafts leases for a corporation's acquisition of oil and gas properties and receives overriding royalty interests as compensation; (3) an employee of a closely held corporation performs services for the corporation's development of oil and gas properties and is compensated by a salary and overriding royalty interest in each lease acquired by the corporation. The first and third examples closely resemble this taxpayer's situation. The Internal Revenue Service determined in each of the three instances that the fair market value of the overriding royalty interests must be treated as taxable income by the recipient. The ruling relied on Section 83 of the Internal Revenue Code and made no reference to GCM 22730 or whether this 1983 ruling was prospective only.[8] The Background information note to this ruling reveals the Service's motive:

> In view of the length of time G.C.M. 22730 and Rev.Rul. 77–176 [see n. 7 of this opinion] have been outstanding, it would not be feasible to revoke them. Reference to G.C.M. 22730, Rev.Rul. 77–176, and the pool of capital doctrine, has been intentionally omitted in the proposed revenue ruling in favor of related factual situations, though sufficiently distinct from the G.C.M. 22730 and Rev. Rul. 77–176. It is believed that this approach is the most effective way to accord compensatory arrangements relating to the acquisition and development of

---

**7.** Taxpayer also relies on a 1977 revenue ruling (Rev.Rul. 77–176, 1977–1 CB 77) which cited GCM 22730. There the Service applied the pool of capital doctrine to the receipt of an interest in a drill site in consideration for drilling a well on that land, but refused to apply the doctrine to additional acreage interests received by the taxpayer in the same transaction since the services were contributed to the drill site, not to the remaining acreage. The ruling is not truly

of assistance to taxpayer because it was expressly limited to transfers after April 1977.

**8.** See Parker, *Contribution of Services to the Pool of Capital: General Counsel Memorandum 22730 to Revenue Ruling 83–46*, 19 Inst. on Oil & Gas L. and Tax'n 315, at 357–358 (1984), for discussion on the ambivalence of the Service as to whether Rev.Rul. 83–46 is prospective or retroactive.

oil and gas properties the same tax treatment under sections 61 and 83 of the Code as other compensatory arrangements in which property interests are received.... Because there has been little guidance from the courts on the scope of the doctrine, restrictive interpretations are justified.

Background information note to Rev.Rul. 83–46 (Dec. 16, 1982) (available by request pursuant to the Freedom of Information Act, 5 U.S.C. § 552 (1982 & Supp. III 1985), as cited in Schwidetzky, *The Pool of Capital Doctrine: A Peace Proposal*, 61 Tul.L. Rev. 519 (1987)). In this 1983 revenue ruling, the Service, although not formally rejecting GCM 22730, has indicated its disfavor with the exception therein by severely limiting the application of the pool of capital doctrine. We likewise express doubt as to the wisdom of judicially endorsing this exception to Sections 61 and 83 of the Code for the oil and gas industry in the absence of legislative intent. For the purposes of this appeal, however, it is unnecessary to reject the doctrine under all factual circumstances, since taxpayer does not meet the exception.

Presented with the "murky" history of the 1941 pool of capital exception, taxpayer relies chiefly on an unsigned 1952 article entitled "Assignment of an Economic Interest for Personal Services" reported in Vol. I, No. 4, Oil and Gas Tax Quarterly (July 1952), as authority for the application of the pool doctrine. There the author, relying on GCM 22730, states that the pool of capital theory will foreclose income taxation if all of the following six factors are present:

1. It must be agreed and prearranged between the parties that the services are contributed and that the contributor is to receive a share right in production, marked by the assignment of an economic interest to him, in return for his contribution.

2. The services contributed may not effect a substitution of capital, rather they must add to the pool of capital already invested in the oil and gas in place.

3. The contribution must perform a function necessary to bringing the property into production or augment the pool of capital already invested in oil and gas in place.

4. The contribution must be specific to the property in which the economic interest is acquired.

5. The contribution must be definite and determinable.

6. The contributor must look only to the economic interest acquired for his "possibility of profit".

The Tax Court applied without adopting taxpayer's proposed six-factor test, finding that taxpayer was unable to meet even a single factor. We agree with the Tax Court that taxpayer has failed to meet the test he proposes here. These enumerated factors, although helpful in understanding the pool of capital doctrine, are not authoritative even if taxpayer were capable of fulfilling each factor as required by the article. Although the Tax Court addressed each factor seriatim, it is sufficient to determine that taxpayer cannot meet the sixth factor of the test which seems to embody the policy behind the doctrine. "Where a contributor contributes services to the pool of capital required for development of a mineral property, however, the pool of capital doctrine creates a presumption that the contributor intends to be compensated solely out of future profits from that mineral property. The various requirements for application of the pool of capital doctrine seem to be designed to assure that this presumption is correct." Parker, *Contribution of Services to the Pool of Capital: General Counsel Memorandum 22730 to Revenue Ruling 83–46*, 19 Inst. on Oil & Gas L. and Tax'n 315 (1984). The pool of capital doctrine arose partly in recognition that when goods and services are contributed to the exploration and development of mineral wells, the receipt of an economic interest in that well represents a capital investment capable of producing future income, yet accompanied by the risk of a dry well. 1 Oil & Gas Tax., No. 4 at 172 (July 1952). "By such arrangements, a lessee commonly lessens his own investment and the risks and burdens

attending development to share the investment obligation and the proceeds of production." GCM 22730 at 221. The doctrine reflects the inequity of taxing the recipient on the speculative value of an economic interest in a pre-production mineral investment, deferring taxation until that interest yields income. *Palmer*, 287 U.S. at 557, 53 S.Ct. at 226–27, *Lee*, 126 F.2d 825, *Dearing*, 102 F.2d 91, *Edwards Drilling*, 95 F.2d 719. This is recognized as the sixth element in the test proposed by the taxpayer in the foregoing 1952 article. The exception to some extent may also reflect a desire to encourage the exploration and development of oil and gas resources prior to the production of oil by postponing any tax consequences until the investment produces cash flow.

Here taxpayer did not look solely to the mineral interests for his possibility of profit. The fractional interests were sold by the taxpayer's corporations to the investors at a price sufficient to render a profit even if a dry well resulted. Further, as an employee of the corporation, taxpayer received a salary from the corporation as partial compensation for his services. The overriding royalties received by the taxpayer were unencumbered by the risks and expenses of production which were borne by the investors in the working royalties. Also, the assignment of the royalty interests to taxpayer were not made until many of the wells were at the production stage, enabling taxpayer to avoid the risk of a dry well. Because he received many of the royalties at a time when they were capable of producing cash flow to fund any tax imposed, it is not inequitable to require taxpayer to include these interests in gross income. Even on those royalties received prior to production, taxpayer was able to shift the risk of loss by selling the fractional working interests in that well at a price sufficient to cover his expenses of lease acquisition and drilling costs and yield a profit. Taxpayer insulated himself from

any further liability through use of the shell corporations from which he was paid a salary and assigned the interests at issue.[9] The overriding royalties received by taxpayer in return for his services did not represent the pre-development economic interests to which he looked solely for his possibility of profit, the situation that the exception was originally intended to address.

The pool of capital doctrine, once acknowledged in GCM 22730, has apparently fallen into disfavor by both the Service and courts. Whatever its original policy justifications, whether to encourage exploration of mineral resources, to avoid immediate taxation of an investment of deferred cash flow, or to delay valuation of a speculative investment until its value is more certain, these arguments are more appropriately addressed to the legislature to justify favored treatment of employees who receive mineral interests as part of compensation in contrast to other employees who receive employer stock as compensation. In any event, taxpayer does not fall within the ambit of the doctrine even as stated in the six-factor test he proposes from the 1952 article since these royalties clearly represent compensation for his services rather than a capital investment.

## II. Valuation of Taxpayer's Overriding Royalty Interests

■ The second issue in this case is whether the Tax Court properly upheld the Commissioner's valuation of taxpayer's overriding royalty interests. Under Section 83(a) of the Internal Revenue Code and the applicable regulations,[10] the fair market value of the taxpayer's overriding interests is to be included in his gross income. The fair market value is a question of fact reviewable under the "clearly erroneous" standard, and the Commissioner's determination of value is presumptively correct. Therefore the taxpayer has the burden of proving otherwise. *See, e.g., Hamm v.*

**9.** See Technical Advice Memorandum 85–20–005 (Jan. 30, 1985) where married taxpayers used a corporate shell to acquire oil and gas leases from which they received a 5% working interest in each well plus cash payments and

were deemed to have received compensation from the corporation.

**10.** 26 C.F.R. § 1.611–2(d)(1).

*Commissioner*, 325 F.2d 934, 937, 938 (8th Cir.1963), certiorari denied, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046.

The Commissioner's valuation of the overriding royalty interests was explained in testimony of Frank Boyd, a petroleum engineer for the Internal Revenue Service, whose credentials include a degree in petroleum engineering, special courses in oil and gas valuation, and continuing education in the area. The witness had previously worked for 10 years for the U.S. Geological Survey, where his responsibilities included valuing mineral interests. Boyd's 68–page report valuing taxpayer's interests was received in evidence without objection at the commencement of the trial before the Tax Court (Exh. BQ). Another engineer, Claude Skaukins, assisted Boyd in valuing these royalty interests. In preparing his report, Boyd used all documents contained in the stipulation of facts that was introduced at the beginning of the trial, as well as work papers prepared by an Internal Revenue Service auditing agent.

### A. *Valuation of Interests in Non–Producing Wells*

 The government expert valued the overriding interests in wells that were not yet producing at the time they were assigned to taxpayer by using the price at which the Wilmar corporations were selling working interests to the public and then valuing the overriding royalty interests by twice that amount. He justified this method of calculating the fair market value of such interests because "the override pays no drilling or operating expense and receives his interest free of all costs." (Boyd report (Exh. BQ) at 3). He added that an overriding royalty is worth twice what a working interest is worth because "[t]he overriding interest is not burden[ed] by any operational development expanse [sic]. Whereas the working interest is. So that all the income you get on the overriding interest is net, whereas a working interest is burden[ed] by operational expense, of course the development expense and the subsequent expense incurred." (Tr. 22).

He elaborated on this approach in further testimony. (Tr. 16–20).

Taxpayer introduced no expert testimony to the contrary. However, he told the Tax Court that he thought the valuation of a royalty interest should be one and one-half times what a working interest is worth (Tr. 116). His briefs do not contain any convincing argument with respect to the valuation of the overriding royalty interests in the then non-producing wells, nor do they seriously fault Mr. Boyd's choice of the multiplier of two rather than one and one-half.

As to such wells, the Tax Court accepted Mr. Boyd's multiplier, adding that it had been applied "to the prices of the working interests as set forth in petitioner's [SEC] Schedules" (App. A14).[11] The judge concluded that this was the only evidence of the fair market value of these interests "that can be given any weight" (*ibid.*). Taxpayer has failed to show that this presumptively correct conclusion was clearly erroneous. Therefore Mr. Boyd's valuation of these interests may not be disturbed.

### B. *Valuation of Interests in Producing Wells*

In valuing taxpayer's overriding royalty interests in wells that were already producing when the interests were granted to taxpayer in 1975 and 1976, Mr. Boyd used reserve reports prepared by Mr. Zuhone's engineer in 1978. He then added the amount of oil and gas produced from the time of the assignments to taxpayer to the dates of the reserve reports and discounted the resulting income projections to value as of the date of the assignments, using a discount rate of 15% per annum (Tr. 21, 23–24; Exh. BQ at 3, 6, 28–32). Although the Commissioner's method was supported by the applicable regulation, 26 C.F.R. § 1.611–2(e)(1), as the taxpayer argues and the government concedes the use of the reserve reports prepared in 1978 was not allowed under the regulations pertaining to valuation of mineral interests, since only those conditions and circumstances known at the time the interests were acquired may

---

**11.** The four SEC Schedules D in the record are trial exhibits for 1973, 1974 and 1975.

be taken into consideration. The taxpayer apparently argues that the use of the 1978 reserve reports to determine the deficiency by the government in contravention of the tax regulations renders the deficiency "arbitrary and excessive" within the meaning of *Helvering v. Taylor,* 293 U.S. 507, 514–15, 55 S.Ct. 287, 290–91, 79 L.Ed. 623, eviscerating the presumption of correctness ordinarily ascribed to deficiency notices and placing the burden of proof on the government.

 If the taxpayer establishes that the Commissioner's determination is arbitrary, courts generally shift the burden of production to the Commissioner. *Clapp v. Commissioner,* 875 F.2d 1396, 1403 (9th Cir.1989). However, the taxpayer's argument, which presumes that the failure of the government to adhere to its promulgated procedures in calculating a tax deficiency necessarily results in an arbitrary and excessive deficiency notice, seriously misconstrues the inquiry required under the arbitrary and excessive doctrine. The arbitrary and excessive doctrine is a challenge to the deficiency assessment itself on the basis that it bears no factual relationship to the taxpayer's liability, not a challenge to any proof offered by the Commissioner at trial before the Tax Court or district court. Courts have consistently held that in determining whether a deficiency notice is arbitrary and excessive, they should routinely refuse to examine the "evidence used or the propriety of the commissioner's motives or administrative policy or procedure in making the determination.... '[T]he Commissioner's determination may often rest upon hearsay or other inadmissible evidence, and we know of no rule of law calling for a review of the materials that were before the Commissioner in order to ascertain whether he relied upon improper evidence.'" *Jackson v. Commissioner,* 73 T.C. 394, 400 (1979) (citations omitted); *Clapp, supra; Scar v. Commissioner,* 814 F.2d 1363 (9th Cir.1987); *Riland v. Commissioner,* 79 T.C. 185, 201 (1982). "The government meets its initial burden of proof in an action to collect tax merely by introducing its deficiency determination." *Anastasato v. Commissioner,*

794 F.2d 884, 887 (3rd Cir.1986). As Judge Cudahy explained in a decision of this Court,

> In general, courts will not look behind an assessment to evaluate the procedure and evidence used in making the assessment.... Rather, courts conduct a *de novo* review of the correctness of the assessment, imposing the risk of nonpersuasion on the taxpayer. In certain quite limited circumstances, however, courts recognize that an assessment should not be accorded even a rebuttable presumption of correctness. For example, when the assessment is shown to be "without rational foundation" or "arbitrary and erroneous," the presumption should not be recognized.... As long as the procedures used and the evidence relied upon by the government to determine the assessment had a rational foundation, the inquiry focuses on the merits of the tax liability, not on IRS procedures.

*Ruth v. United States,* 823 F.2d 1091, 1094 (7th Cir.1987); See also *Pfluger v. Commissioner,* 840 F.2d 1379, 1382–1383 (7th Cir.1988), certiorari denied, —— U.S. ——, 108 S.Ct. 2906, 101 L.Ed.2d 938.

Courts have occasionally declined to accord a presumption of correctness to the deficiency notice and examined the procedures employed by the Commissioner in the context of unreported illegal income where the government simply relies on the presumption of correctness without introducing substantive evidence to link the taxpayer to the income-generating activity in question. See, *e.g., United States v. Janis,* 428 U.S. 433, 441, 96 S.Ct. 3021, 3026, 49 L.Ed.2d 1046, where a " 'naked' assessment ... may be one 'without rational foundation and excessive,' and not properly subject to the usual rule with respect to the burden of proof in tax cases"; *Weimerskirch v. Commissioner,* 596 F.2d 358 (9th Cir.1979), *Jackson, supra, Llorente v. Commissioner,* 649 F.2d 152 (2d Cir.1981), *Dellacroce v. Commissioner,* 83 T.C. 269 (1984).

The presumption of correctness attached to the Commissioner's determination virtually regardless of the information, proce-

dures or policies used recognizes the structural inequality of information in the possession of the Commissioner relative to the taxpayer as well as the *de novo* nature of the refund/deficiency challenge suit in which the trial court will not inquire into the administrative record behind the determination. The Ninth Circuit explained further the rationale behind the presumption of correctness, in spite of the methodology or procedure followed, in *Clapp*, 875 F.2d at 1402–1403:

> Appellants' argument for greater substantive review of the Commissioner's 'determination' mistakes the nature of the notice of deficiency. The notice of deficiency does not result in final liability on the part of taxpayer. If the taxpayer files a petition in the Tax Court, liability will be adjudicated prior to payment. 26 U.S.C. § 6213. The notice of deficiency merely hails the taxpayer into court. The Tax Court has as its purpose the redetermination of deficiencies, through a trial on the merits, following a taxpayer petition.... Issuing a notice of deficiency is in many ways analogous to filing a civil complaint.... [I]f the taxpayer establishes that the Commissioner's determination is arbitrary, courts generally shift the burden onto the Commissioner, putting the commissioner in the same position as a civil plaintiff.

■ If the taxpayer is successful in showing that the assessment is arbitrary and excessive or without factual foundation, the presumption drops from the case. There is, however, a conflict among the circuits as to whether the burden of persuasion is shifted to the Commissioner as well as the burden of production, as noted but not resolved by the Supreme Court in *United States v. Janis*, 428 U.S. 433, 442, 96 S.Ct. 3021, 3026, 49 L.Ed.2d 1046. Some courts have imposed a lesser burden of proof on the taxpayer in situations where imposing the ultimate burden of persuasion on the taxpayer would require the taxpayer to prove a negative proposition such as the non-existence of allegedly unreported income. See, *e.g., Llorente*, 649 F.2d 152 (2d Cir.1981); *Weir v. Commissioner*, 283 F.2d 675, 679 (6th Cir.1960); *Cohen v. Commis-*

*sioner*, 266 F.2d 5 (9th Cir.1959); see also *Rockwell v. Commissioner*, 512 F.2d 882, 886 (9th Cir.1975), certiorari denied, 423 U.S. 1015, 96 S.Ct. 448, 46 L.Ed.2d 386; *Baird v. Commissioner*, 438 F.2d 490, 494–95 (Biggs, J., dissenting) (3rd Cir.1971). We need not resolve this question since taxpayer has failed to demonstrate that the assessment was arbitrary and excessive or without factual foundation to remove the presumption of correctness from the Commissioner's assessment. Taxpayer does not contend that the assessment was arbitrary in the sense that he is unrelated to the tax-generating activity as in the cases involving unreported illegal income. Most importantly, taxpayer does not assert, much less offer evidence, that the fair market value determined by the use of the 1978 reserve reports was excessive. Taxpayer cannot assert that the mere use of a method of calculation not provided for in the regulations renders the assessment arbitrary and excessive. As noted above, an inquiry into the procedure used to calculate the deficiency to determine whether the assessment is arbitrary and excessive has been regularly rejected by the courts with the exception of the "naked assessment" scenario. "The commissioner may use any reasonable method of calculation where, as in this case, the taxpayer fails to produce or maintain adequate records from which actual income may be ascertained." *Goodmon v. Commissioner*, 761 F.2d 1522, 1524 (11th Cir.1985); *Cummings v. Commissioner*, 410 F.2d 675, 678 (5th Cir.1969). The trial court is concerned with determining whether the assessment contains the correct amount of the deficiency, rather than examining the administrative procedure employed in determining the deficiency absent allegations of a constitutional deprivation. Indeed, some courts have stated: "If the assessment is right on any theory it must be sustained." *Blansett v. United States*, 283 F.2d 474, 478 (8th Cir. 1960); *Cummings*, 410 F.2d at 679; *Bernstein v. Commissioner*, 267 F.2d 879, 881 (5th Cir.1959).

Neither is the failure of the government to follow its own regulations otherwise

"unfair" or "inequitable" [12] unless the taxpayer demonstrates that the deviation from procedure resulted in an excessive deficiency or an assessment without any factual foundation. The use of information collected by the government subsequent to the taxable years in question, although not provided for in the regulations, was certainly a rational method of calculating the fair market value of the mineral interests, possibly even producing a more accurate valuation than available in the taxable years at issue. Indeed the 1978 reserve reports may have indicated that the wells would produce less oil in the future than had been expected at the time the interests were transferred, thus resulting in a market value lower than would have been calculated based on the information available at the time the interests were acquired.[13]

The accuracy of the Commissioner's method, of course, is irrelevant if the value ascertained by using the 1978 reserve reports is higher than would have resulted using solely that information available in the two taxable years in question. But taxpayer has not presented a single piece of concurrent evidence, such as reserve reports from the taxable years in question, offers to purchase taxpayer's mineral interests, purchase prices of comparable mineral interests during the taxable years, or electric log analyses, to indicate that the value would be lower if the 1978 reserve reports were not used. The presumption of correctness, therefore, does not require a showing of the correct value of the interest under a calculation method prescribed by the regulations. Rather, the taxpayer must simply show that the value is excessive. He has not done so.

Having determined that the assessment was not arbitrary or excessive, therefore the presumption of correctness applies, it must be determined whether taxpayer has carried his burden of producing sufficient evidence to shift the burden of production to the Commissioner. Taxpayer bears both the burden of production and burden of persuasion where the deficiency notice is not found to be arbitrary or without rational basis. *Ruth,* 823 F.2d at 1093. As stated by the Supreme Court in *Taylor:* "[f]requently, if not quite generally, evidence adequate to overthrow the commissioner's finding is also sufficient to show the correct amount, if any that is due." *Taylor,* 293 U.S. at 515, 55 S.Ct. at 291. Here taxpayer failed to present any evidence to rebut the Commissioner's *prima facie* case of a deficiency other than attacking the procedure underlying the notice of deficiency, an inquiry in which this Court will not engage absent exceptional circumstances not present here. Taxpayer, who presumably has superior access to information concerning the value of the mineral interests at the time of acquisition, has utterly failed to produce any independent evidence to demonstrate that the market value of the overriding royalties was less than the amount contained in the deficiency. Instead, taxpayer relied solely on his

12. In *United States v. Caceres,* 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733, the Supreme Court ruled that the failure of the IRS to follow its own regulations, when compliance is not mandated by the Constitution or statutes, in recording conversations of its agents and the taxpayer does not rise to the level of a constitutional violation. See also *Foxman v. Renison,* 625 F.2d 429, 431–32 (2d Cir.1980), certiorari denied, 449 U.S. 993, 101 S.Ct. 530, 66 L.Ed.2d 290, where violation by the IRS of its own post-audit review procedures did not violate the due process clause. Accord, *Raheja v. Commissioner,* 725 F.2d 64, 68 (7th Cir.1984).

13. Taxpayer testified that once a well begins producing, it is difficult to value the well based on the production until after about one year due to the sharp decline which occurs in the first years of production:

[Zuhone]: Well you want to wait about six to eight months before you value it, because the decline curves terrific after it first come in. [Mr. Heller, taxpayer's attorney]: What do you mean by decline curve?
A: Well it come in like I say 50 barrels a day and go down to 10 barrels.

\* \* \* \* \* \*

Q: Is there any way to tell at the time you complete the well what the production is going to be six, eight, nine months down the road?
A: No, there is not.
Q: Why is that?
A: Because the decline curve, you have to have a production history before you can make a decline curve.
(Tr. 106–107; see also Tr. 132.)

own non-expert testimony and the cross-examination of the government's expert to sustain his burden of proof. Such evidence completely fails to undermine the value employed by the Commissioner. Taxpayer has therefore failed to rebut the presumption of correctness to shift the burden of proof, much less carry the burden of persuasion. Although we hold that use of after-the-fact data does not necessarily remove the presumption of correctness under these particular facts, this procedure violates regulations as well as fundamental valuation principles and is hardly to be encouraged.

The decision of the Tax Court is affirmed.