**GOLD EMPORIUM, INC., Michael J. Malicki and Kathleen Malicki, Petitioners–Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.**

No. 89–2451.

United States Court of Appeals, Seventh Circuit.

Argued April 9, 1990.

Decided Aug. 14, 1990.

Rehearing Denied Nov. 5, 1990.

Richard J. Sankovitz, Whyte & Hirschboeck, Robert E. Dallman, Mulcahy & Wherry, Milwaukee, Wis., for petitioners-appellants.

Richard Farber, Gary R. Allen, David M. Moore, Janet Bradley, Dept. of Justice, Tax Div., Appellate Section, Charles S. Casazza, U.S. Tax Court, Peter K. Scott, I.R.S., Washington, D.C., for respondent-appellee.

Before BAUER, Chief Judge, FLAUM and RIPPLE, Circuit Judges.

BAUER, Chief Judge.

Petitioners Gold Emporium, Inc. ("Gold Emporium"), Michael J. Malicki ("taxpayer" or "Malicki") and Kathleen Malicki (referred to together with Michael Malicki as "the Malickis") appeal the United States Tax Court's decision upholding, in part, the Commissioner of Internal Revenue's ("Commissioner") tax deficiency assessment against them for unreported income during the tax years 1980 and 1981. Petitioners seek review only of the Tax Court's finding that Gold Emporium received unreported income from Avon Metal Services, Ltd. ("Avon" or "Avon Metal") in 1980 in the amount of $131,648.67.[1] Petitioners argue that the Commissioner's assessment is not entitled to the "presumption of correctness", normally accorded to his determinations, *see generally Welch v. Helvering,* 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212 (1933); *Lerch v. Commissioner,* 877 F.2d 624, 631 (7th Cir.1989), because the Commissioner depended on "unreliable" evidence from his witness, Irwin Bard, in calculating the petitioners' tax deficiency. For the following reasons, we affirm the Tax Court's judgment.

## I.

Prior to and during 1980 and 1981, Malicki operated Gold Emporium, a storefront business located in Wauwatosa, Wisconsin which engaged in the purchase and sale of scrap gold, jewelry, coins and other precious metals. Gold Emporium sold its merchandise to the public and to various businesses also engaged in the buying of scrap metal for resale. Among those businesses was Avon Metal, operated by Irwin Bard out of his home in Milwaukee. Malicki and Bard each acted as President and sole shareholder of their respective businesses and conducted approximately 90–95% of their transactions in cash.

Neither Gold Emporium nor Avon Metal kept complete records of their transactions. For example, Gold Emporium maintained its records of cash purchases in purchase receipt books. In recording its sales, Gold Emporium used sales invoices which, every few days, would be tallied on the back of a calendar page. These pages were then stapled to the invoices for use as "informal deposit slips" for depositing funds into Gold Emporium's checking account. Gold Emporium did not receive payment from some customers until weeks after a sale.

---

1. For fiscal tax year 1981, the Commissioner assessed a deficiency of $1,720.00 against Gold Emporium. The Tax Court upheld this assess-ment and it remains uncontested on appeal, as do the court's conclusions that the Malickis diverted the unreported income to their own use.

Malicki made notations on scratch paper to reflect these accounts receivable, but he discarded the notes when payment was received. Malicki transmitted Gold Emporium's purchase receipts to its accountant, Michael Lanko, who maintained these records in a ledger book. Lanko recorded sales based on the deposits Malicki made to the corporate checking account, in addition to the sales invoices, and the informal deposit slips. For purposes of filing the corporate tax return, Lanko relied on the record ledger, sales invoices, cancelled checks and the purchase receipt books. Malicki did not inform Lanko of any unpaid accounts.

As for Avon Metal's records, Bard recorded his transactions differently for mail customers, and for in-person customers. Bard kept no records of purchases from vendors, like Gold Emporium, except for his telephone log and daily log. Bard's telephone log entries contained information about his purchases, *i.e.*, dates, quantities and purchase price. In his daily log, Bard recorded Avon's cash purchases.

During late 1979 and early 1980, with the price of gold soaring,[2] Gold Emporium capitalized on the good market conditions by purchasing and reselling large quantities of gold and scrap metal. Gold Emporium's Federal corporate income tax returns showed that Gold Emporium purchased $3,880,046.28 in merchandise in fiscal year 1980 and $1,001,339.51 in fiscal year 1981. Gold Emporium listed gross receipts on its tax returns of $4,355,351.46 and $1,707,-332.73 for the tax years 1980 and 1981, respectively.

During the same period, Avon Metal received cash advances from a gold refinery in Chicago so that it could purchase gold and take advantage of the favorable gold market. Avon Metal, which paid 91 to 92 percent of the market value for gold it purchased, resold the gold for 98 percent of its market value to the Chicago refinery. Within a short time, however, the refinery slowed down and then discontinued advancing funds to Avon because the refinery was unable to borrow funds to purchase gold. Without these cash advances, Avon Metal was unable to pay its suppliers, including Gold Emporium, in a timely fashion. Between mid-January 1980 and mid-April 1980, Avon Metal paid its customers up to eight weeks after delivery and the business suffered as a result.

While Avon Metal's business slowed down, Gold Emporium turned to other companies to sell its merchandise. One such company, Pease & Curren, began purchasing gold and scrap metal from Gold Emporium, paying approximately 98 percent of the market value for Gold Emporium's scrap metal. Pease & Curren paid for its purchases by check or one-ounce rectangular gold bars known as Suisse credits.[3] From January until October of 1980, Pease & Curren took from one month to eight to ten weeks to pay Gold Emporium for its purchases. For fiscal year 1980, Gold Emporium deposited all checks from Pease & Curren into its corporate checking account. These funds were listed as gross receipts for purposes of reporting on the federal tax return. Malicki did not prepare a sales invoice or other receipt for the Pease & Curren Suisse credits nor did he deposit them into Gold Emporium's checking account or treat the credits as taxable income.[4]

Gold Emporium's records reflect only three sales to Avon Metal, on June 10, December 5, and December 29, 1980. In

---

**2.** Evidence submitted by the parties before the Tax Court included the condition of the gold market during the tax years at issue. In January 1980, for instance, the price of gold reached a peak of $800 per ounce in London and $845 per ounce in New York.

**3.** There is much discussion in the Tax Court's decision about the difference between the Suisse credits and Krugerrands, which are one-ounce gold & alloy coins issued by the Republic of South Africa, both of which Pease & Curren used for payment. Because these are not at issue on appeal, the method which Pease & Curren used to pay will simply be referred to as Suisse credits.

**4.** *Petitioners do not contest the Tax Court's findings regarding their receipt of unreported income from these so-called "Pease & Curren" transactions in Suisse credits (to the tune of $50,897.70).*

contrast, Bard's daily log showed that Avon Metal purchased from Gold Emporium on nine different occasions.[5]

The Commissioner reviewed the transactions conducted by Gold Emporium and Avon Metal during a 1983 investigation of thirty-seven coin dealers operating in Wisconsin. The following list represents the sales (all but two were cash) transactions which the Commissioner determined Gold Emporium engaged in with Avon Metal but failed to report as income:

| Date | Amount |
|---|---|
| January 7, 1980 | $ 3,007.00 |
| January 28, 1980 | 29,850.12 |
| January 29, 1980 | 60,393.00 |
| March 6, 1980 | 5,325.00 |
| March 31, 1980 | 26,151.00 |
| April 17, 1980 | 20,473.00 |
| April 30, 1980 | 32,873.00 |
| June 10, 1980 | 19,169.00 [6] |
| December 30, 1980 | 4,300.00 |
| Total | $201,541.67 |

Based on these transactions and others,[7] the Commissioner assessed a tax deficiency against Gold Emporium of $271,174 for fiscal year 1980, and $1,720 for fiscal year 1981. The Commissioner also claimed additions to tax for fraud by Malicki under 26 U.S.C. § 6653 of $135,587 for 1980 and $860 for 1981. Based on the Commissioner's conclusion that the unreported income was diverted by Malicki to his own use, the Commissioner claimed that the Malickis owed $445,572.82 in taxes for unreported income for 1980, and an addition to tax for fraud of $222,786.41.[8] Gold Emporium and the Malickis petitioned for review of the Commissioner's assessments before the Tax Court and the cases were consolidated for trial.

At trial, both Bard and Malicki testified, as did Lanko and the IRS agents. Malicki testified that Gold Emporium discontinued selling scrap metal to Avon in mid-January when Avon began paying for purchases eight weeks following the sale of merchandise. Bard testified, however, that although his business fell dramatically when the Chicago refinery discontinued advancing funds to him, Gold Emporium and Avon Metal continued to transact business as his accounts and records revealed. The Tax Court stated that "[b]ased on our assessment of the credibility of both Bard and Malicki, and the reliability of their corporations' books and records, we considered their testimony with only a grain of salt."

In reviewing the evidence, the Tax Court noted that Gold Emporium purchased a sufficient quantity of scrap gold during the relevant time period for it to engage in sales with both Avon Metal and Pease & Curren. The court also took into account the fact that Gold Emporium and Avon Metal "had dealings before and after the disputed sales allegedly occurred." In addition, the court noted that Malicki placed phone calls to Bard during the time when the alleged transactions took place. At trial, Malicki claimed that he placed those calls only to determine Avon's prices. Bard testified that Malicki and he conducted business transactions based on the phone calls. The court also considered evidence that Pease & Curren, like Avon Metal, took eight to ten weeks to pay for its purchases at the time when Gold Emporium allegedly discontinued business with Avon Metal for its failure to pay in less than eight weeks. Finally, the court considered that the Pease & Curren transactions involved shipping and other costs, in addition to the delay in payment, and that Malicki had large, unexplained deposits to his checking account and carried a great deal of cash with him at all times.

Following this exhaustive review of the evidence, the Tax Court concluded that it

**5.** The nine transactions are those listed below as part of the Commissioner's determination.

**6.** According to the Commissioner, $9,500 of this sale was accounted for on Gold Emporium's tax returns.

**7.** The Commissioner also determined that Gold Emporium received 96 Suisse credits from Pease & Curren which Gold Emporium failed to report in addition to receiving and failing to report income from a commodities trading account.

**8.** Kathleen Malicki was included in this action because she filed a joint federal income tax return with her husband. The additions to tax for fraud were not requested against her.

was "more probable that Gold Emporium continued to do business with Avon Metal [during 1980 and 1981] ... which was not included in the store's gross receipts." The Tax Court upheld the Commissioner's determination that Gold Emporium received unreported income from sales made to Avon Metal, but refused to uphold one assessment, an alleged $60,393 sale by Gold Emporium to Avon Metal on January 29, 1980, because it was "far in excess of the amount of any other transaction" and "appears inconsistent with Gold Emporium's practices." In total, the court found that Gold Emporium received $131,648.47 during fiscal year 1980 from the sale of gold and other items to Avon Metal which Gold Emporium failed to report and which Malicki diverted to his own use. The Tax Court did not find any fraud on Malicki's part in failing to report the income, nor did it find fraud in the manner in which Gold Emporium's business records were kept.

## II.

■ On appeal, the petitioners contend that the Tax Court erred in according the "presumption of correctness" to the Commissioner's deficiency assessment because it was based on arbitrary and unsupported evidence. Gold Emporium and the Malickis argue that the presumption of correctness cannot apply in this case because in calculating Gold Emporium's tax deficiency the government relied on evidence, primarily from Bard, which was without rational foundation.

■ Generally speaking, the Commissioner's tax deficiency assessments are entitled to the "presumption of correctness." This presumption imposes upon the taxpayer the burden of proving that the assessment is erroneous. *See Welch v. Helvering*, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212 (1933); *Lerch v. Commissioner*, 877 F.2d 624, 631 (7th Cir.1989); *Pfluger v. Commissioner*, 840 F.2d 1379, 1382 (7th Cir. 1988). In limited cases, courts will not recognize the presumption, however, if an assessment is shown to be "without rational foundation" or is "arbitrary and erroneous." *Zuhone v. Commissioner*, 883 F.2d 1317, 1325 (7th Cir.1989) (quoting *Ruth v. United States*, 823 F.2d 1091, 1094 (7th Cir.1987)). This court recently discussed the relevant inquiry used when a challenge based on arbitrariness is made against the Commissioner's determination. In *Zuhone*, we noted that "[t]he arbitrary and excessive doctrine is a challenge to the deficiency assessment itself on the basis that it bears no factual relationship to the taxpayer's liability, not a challenge to any proof offered by the Commissioner at trial before the Tax Court or district court." 883 F.2d at 1325. In this respect, our court will not review "the commissioner's motives or administrative policy or procedure in making the determination." *Id.* In addition, we "will not look behind an assessment to evaluate the procedure and evidence used in making the assessment.... Rather, courts conduct a *de novo* review of the correctness of the assessment, imposing the risk of nonpersuasion on the taxpayer." *Ruth*, 823 F.2d at 1094.

The "presumption of correctness" is appropriate where evidence existed which linked the taxpayers, in this case Gold Emporium and Malicki, with "the tax-generating activity." *Anastasato v. Commissioner*, 794 F.2d 884, 887 (3d Cir.1986); *see also Zuhone*, 883 F.2d at 1326. If the taxpayer demonstrates that the assessment is arbitrary and excessive or without factual foundation, then the presumption no longer applies. *Zuhone*, 883 F.2d at 1326. In those situations, it is unclear "whether the burden of persuasion is shifted to [the] Commissioner as well as the burden of production." *Id.* (citing *United States v. Janis*, 428 U.S. 433, 442, 96 S.Ct. 3021, 3026, 49 L.Ed.2d 1046 (1976) (the issue was raised but not decided)). We need not reach this issue, however, because we remain unpersuaded by petitioners that the presumption of correctness should not apply in this case.

The Commissioner presented evidence that linked Gold Emporium to the income-generating activity, *i.e.*, the gold sales, in several ways. The Commissioner presented evidence that Gold Emporium conducted business with Avon Metal prior to and fol-

lowing the period between January and April/May 1980. Numerous calls were placed by Malicki during this same time period, and Malicki was purchasing and selling in quantities sufficient to sell to both Avon Metal and Pease & Curren. Finally, Bard's records, although incomplete and of questionable accuracy, did reflect transactions which could account for the large amounts of cash which Malicki kept on hand and deposits which were unaccountable from recorded sales to other customers. In our estimation, this evidence established the required link between Gold Emporium, Malicki and the income-producing activity.

Whether the Tax Court chose to accept or reject Malicki's or Bard's testimony does not affect the initial determination that the Commissioner's assessment is entitled to the presumption of correctness, especially here where "the taxpayer fail[ed] to produce or maintain adequate records from which actual income [could] be ascertained." *Zuhone*, 883 F.2d at 1326 (citing *Goodmon v. Commissioner*, 761 F.2d 1522, 1524 (11th Cir.1985); *Cummings v. Commissioner*, 410 F.2d 675, 678 (5th Cir. 1969)). Rather, we think that this is a matter of proof which the court in *Zuhone* noted as difficult at best.

■ Having concluded that the presumption of correctness properly attached to the Commissioner's deficiency assessment because the Commissioner presented evidence which linked the petitioners to the income-generating activity, we now review the Tax Court's judgment finding that Gold Emporium received an unreported $131,648.67 from sales to Avon Metal during 1980. For this analysis, we employ a clearly erroneous standard of review. *See Commissioner v. Duberstein*, 363 U.S. 278, 291, 80 S.Ct. 1190, 1199–1200, 4 L.Ed.2d 1218 (1960); *Lerch*, 877 F.2d at 631. Much of the evidence at trial was subject to credibility determinations by the Tax Court. The court found neither Bard nor Malicki to be credible witnesses and the records from their respective businesses were incomplete and their incompleteness obscured the underlying transactions. Needless to say, the

Tax Court's credibility determinations are entitled to deference. *See Manzoli v. Commissioner*, 904 F.2d 101 (1st Cir.1990); *Henson v. Commissioner*, 835 F.2d 850, 853 (11th Cir.1988). *See generally Anderson v. City of Bessemer City*, 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985). Gold Emporium shouldered the burden of proof in attempting to discredit the Commissioner's assessment. Based on the entire record, we conclude that the Tax Court's judgment is not clearly erroneous.

The judgment of the Tax Court is AFFIRMED.